(Nos. 72793, 72803 cons.—

ANTHONY N. KOLEGAS *et al.*, Appellants and Cross-Appellees, v. HEFTEL BROADCASTING CORPO-RATION *et al.* (Heftel Broadcasting Corporation, Appellee and Cross-Appellant).

*Opinion filed December 4, 1992.*

2

4

FREEMAN, J., specially concurring.

John R. Wimmer, of Downers Grove, for appellants and cross-appellees.

Baker & McKenzie, of Chicago (Francis D. Morrissey, Thomas F. Tobin, Michael A. Pollard and John M. McGarry, of counsel), for appellee and cross-appellant.

JUSTICE BILANDIC delivered the opinion of the court:

The plaintiffs, Anthony, Donna and Christopher Kolegas, brought an action in the circuit court of Du Page County against the defendants, Tim and Beth Disa, two WLUP-AM radio disc-jockeys, Heftel Broadcasting Corporation, and Evergreen Media Corporation of Chicago AM. The four-count complaint sought damages for defa-

mation, publication of an injurious falsehood, invasion of privacy, and reckless infliction of emotional distress. The defendants filed a motion to dismiss the complaint, pursuant to section 2—615 of the Code of Civil Procedure (Ill. Rev. Stat. 1991, ch. 110, par. 2—615). Following a hearing, the trial court granted the defendants' motion and dismissed all counts of the complaint. The plaintiffs appealed. The appellate court reversed that portion of the trial court's order which dismissed the defamation count, but affirmed the dismissal of all other counts. (217 Ill. App. 3d 803.) Both the plaintiffs and defendant Heftel Broadcasting Corporation filed petitions for leave to appeal in this court. We allowed both petitions (134 Ill. 2d R. 315).

This action was brought as a result of a radio broadcast which took place on April 26, 1988. According to the complaint, Anthony Kolegas was engaged in the business of promoting and producing classic cartoon festivals. In April 1988, Kolegas was preparing for a cartoon festival to be held on April 30 and May 1, 1988, at the Odeum Stadium in Villa Park. The cartoon festival was to be a benefit to promote public awareness of neurofibromatosis, a serious neurological disorder, which, according to the complaint, is commonly known as Elephant Man disease. Kolegas intended to donate a portion of the proceeds of the festival to the National Neurofibromatosis (NF) Foundation. The complaint also alleges that Kolegas' wife, Donna, and his five-year-old son, Christopher, are afflicted with the disease.

Kolegas hired Evergreen Media Corporation of Chicago AM to advertise the festival on WLUP-AM from April 25, 1988, through May 1, 1988. On April 26, the advertisement aired during the broadcast of a radio program featuring Tim and Beth Disa. Shortly after the advertisement aired, Kolegas telephoned WLUP-AM. A conversation ensued between Kolegas and the Disas on

the air. Kolegas was allowed to introduce himself by name as the producer of the cartoon festival described in the preceding advertisement. Kolegas described the festival and gave the dates, times and location of the festival.

During the conversation, Kolegas stated that a portion of the proceeds from the festival would go to benefit the NF Foundation. In response to questions posed by Beth Disa, Kolegas explained that NF was neurofibromatosis, or Elephant Man's disease. Beth Disa asked Kolegas how he was involved and Kolegas replied that his wife and son had Elephant Man's disease. Tim Disa then stated on the air, "You're gone," and hung up on Kolegas.

The complaint alleges that shortly after disconnecting Kolegas, Tim Disa stated on the air that Kolegas was "not for real." Beth Disa responded that Kolegas was just "scamming" them. The complaint also charges that both Tim and Beth Disa stated that there was "no such show as the classic cartoon festival" described by Kolegas.

The complaint further alleges that Tim Disa stated, "Why would someone marry a woman if she had Elephant Man disease? It's not like he couldn't tell—unless it was a shotgun wedding." Beth Disa allegedly replied that it must have been a shotgun wedding. Shortly after the comments concerning the shotgun wedding, Tim Disa stated, "If he is producing it, he's only producing it part-time. The rest of the time he's too busy picking out their wardrobe. You know, he has to make sure they have large hats to cover their big heads and make sure that all of their collars are big enough to fit." Beth Disa allegedly indicated her agreement with that statement.

The complaint also alleges that Anthony and Donna Kolegas were not married in a "shotgun" wedding, and that Donna and Christopher Kolegas do not have abnor-

mally large heads. The complaint states that Tim and Beth Disa made and broadcast such statements wantonly and maliciously, and with knowledge of their falsity, or with reckless disregard for their truth or falsity.

Count I of the complaint seeks damages for defamation; count II seeks damages for the tort of publication of injurious falsehood; count III seeks damages for invasion of privacy (publicity placing the plaintiffs in a false light); and count IV seeks damages for reckless infliction of emotional distress. As stated, the trial court granted the defendants' motion to dismiss all counts of the complaint for failure to state a cause of action. (Ill. Rev. Stat. 1991, ch. 110, par. 2—615.) The appellate court affirmed the dismissal of counts II, III and IV of the complaint, but reversed the dismissal of count I and remanded the cause for further proceedings on that claim. 217 Ill. App. 3d 803.

In this court, the defendants appeal from that portion of the appellate court decision which reinstated count I (defamation) of the complaint. The plaintiffs cross-appeal from that portion of the appellate court judgment which affirmed the dismissal of count III (false light) and count IV (reckless infliction of emotional distress) of the complaint. Neither party has appealed from that portion of the appellate court decision which affirmed the dismissal of count II (publication of an injurious falsehood) of the complaint. We therefore do not address the dismissal of count II.

In resolving this appeal, we bear in mind the general principles that govern a motion to dismiss brought pursuant to section 2—615 (Ill. Rev. Stat. 1991, ch. 110, par. 2—615). A section 2—615 motion attacks the legal sufficiency of a complaint. Such a motion does not raise affirmative factual defenses but alleges only defects on the face of the complaint. (*Urbaitis v. Commonwealth Edison* (1991), 143 Ill. 2d 458, 475.) In ruling on a section

2—615 motion to dismiss, the court must accept as true all well-pleaded facts in the complaint and all reasonable inferences which can be drawn therefrom. (*McGrath v. Fahey* (1988), 126 Ill. 2d 78, 90; *Schaffer v. Zekman* (1990), 196 Ill. App. 3d 727, 731.) The question presented by a motion to dismiss a complaint for failure to state a cause of action is whether sufficient facts are contained in the pleadings which, if established, could entitle the plaintiff to relief. (*Urbaitis v. Commonwealth Edison* (1991), 143 Ill. 2d 458, 475.) In making this determination, the court is to interpret the allegations of the complaint in the light most favorable to the plaintiff. *McGrath v. Fahey* (1988), 126 Ill. 2d 78, 90.

## I. Defamation

Bearing these general principles in mind, we first consider whether the allegations in count I of the complaint are sufficient to support a cause of action for defamation. Count I was brought in the name of Anthony Kolegas alone and was based upon three statements allegedly made by Tim and Beth Disa. In particular, count I refers to the Disas' statements that Kolegas "was not for real," that Kolegas was "scamming" them, and that there was "no such show as the classic cartoon festival." Count I alleges that these statements were false and defamatory, and prejudiced Kolegas in his business of producing and promoting classic cartoon festivals. Count I also alleges that, as a proximate result of these statements, Kolegas was greatly injured in his reputation and business, and that the attendance receipts earned from the festival were greatly diminished. None of the remarks relating to neurofibromatosis ("Elephant Man disease") is the subject of count I.

The defendants proffer two arguments in support of the trial court's dismissal of count I. They claim first that the Disas' statements may not be considered defam-

atory because the statements are reasonably susceptible to an innocent construction. Second, they argue that, even if the statements are defamatory, they are nevertheless protected under the first amendment. The plaintiffs respond that count I adequately states a cause of action for defamation and was properly reinstated by the appellate court.

## A. *Innocent Construction*

We first consider whether the Disas' statements may be considered defamatory. A statement is considered defamatory if it tends to cause such harm to the reputation of another that it lowers that person in the eyes of the community or deters third persons from associating with him. (Restatement (Second) of Torts §559 (1977).) Statements may be considered defamatory *per se* or *per quod*. Statements are considered defamatory *per se* when the defamatory character of the statement is apparent on its face—that is, when the words used are so obviously and materially harmful to the plaintiff that injury to his reputation may be presumed. (*Owen v. Carr* (1986), 113 Ill. 2d 273.) Statements are considered defamatory *per quod* if the defamatory character of the statement is not apparent on its face, and extrinsic facts are required to explain its defamatory meaning. (*Schaffer v. Zekman* (1990), 196 Ill. App. 3d 727.) Here, the plaintiffs allege only that the Disas' statements were defamatory *per se*.

Our courts have recognized four categories of statements that are considered defamatory *per se*: (1) words which impute the commission of a criminal offense; (2) words that impute infection with a loathsome communicable disease; (3) words that impute an inability to perform or want of integrity in the discharge of duties of office or employment; or (4) words that prejudice a party, or impute lack of ability, in his or her trade, profession or business. *Costello v. Capital Cities Communi-*

*cations, Inc.* (1988), 125 Ill. 2d 402, 414; *Owen v. Carr* (1986), 113 Ill. 2d 273.

Even if a statement falls into one of these categories, however, it will not be found defamatory *per se* if it is reasonably capable of an innocent construction. The innocent-construction rule requires courts to consider a written or oral statement in context, giving the words and implications therefrom their natural and obvious meaning. If, so construed, a statement "may reasonably be innocently interpreted," it will not be regarded as defamatory *per se. (Chapski v. Copely Press* (1982), 92 Ill. 2d 344, 352; *Mittelman v. Witous* (1989), 135 Ill. 2d 220, 233.) Only *reasonably* innocent constructions will remove an allegedly defamatory statement from the *per se* category. (*Mittelman v. Witous* (1989), 135 Ill. 2d 220; *Costello v. Capital Cities Communications, Inc.* (1988), 125 Ill. 2d 402.) Whether a statement is reasonably susceptible to an innocent interpretation is a question of law for the court to decide. *Chapski,* 92 Ill. 2d at 352.

We conclude that the Disas' statements could be found to be defamatory *per se.* There can be no dispute that the comments fall into two of the four categories of statements that are considered defamatory *per se (i.e.,* words that impute a want of integrity in the discharge of employment duties and words that prejudice a party in his business). The statements implied that Kolegas lacked integrity in performing his professional duties and also prejudiced him in his business. According to the allegations in count I, Kolegas was in the business of producing and promoting classic cartoon festivals. In conducting the promotion end of this business, Kolegas paid WLUP to advertise an upcoming festival. An advertisement promoting the festival was broadcast during the Disas' radio program. As an accompaniment to this advertisement, Kolegas introduced himself on the air as the producer of the festival and gave more information

about the festival. Shortly thereafter, the Disas made the offending statements that Kolegas "was not for real," that Kolegas was "scamming" them, and that "there was no such show as the classic cartoon festival." These statements clearly referred to the festival that Kolegas had paid WLUP to promote. Furthermore, these statements unequivocally informed the listening public that the festival that Kolegas was promoting would not actually take place. The Disas' statements also implicitly accused Kolegas of lying and of attempting to deceive WLUP, and the public at large, about the festival and the fact that it would benefit a charitable organization. Such statements certainly could be found to have damaged Kolegas' integrity and to have prejudiced him in his business of promoting and producing classic cartoon festivals.

We are not persuaded that there is a reasonably innocent construction for the Disas' statements which would remove those statements from the defamatory *per se* category. The defendants suggest two possible constructions for the Disas' statements. First, the defendants claim that the comments simply expressed the Disas' belief that Kolegas was an imposter pretending to be the festival's producer. Second, the defendants claim that the comments may reasonably be construed as an attempt to express humorously the fact that they did not believe the information that Kolegas was providing them.

We are not persuaded by either of the proposed "innocent" constructions. The first interpretation is contrary to the natural and obvious meaning of the words that the Disas used. The Disas did not simply suggest that Kolegas was not actually the producer of the festival. Instead, they expressly stated that there was no such thing as the classic cartoon festival.

The defendants' second proposed construction amounts to nothing more than a claim that the statements should be innocently construed because the Disas were trying to be funny. We find, however, that, when viewed in context and given their natural and ordinary meaning, the Disas' statements could only be understood to imply that Kolegas was lying and that there was, in fact, no classic cartoon festival. The Disas' comments that Kolegas was "not for real," was "scamming" them and that "there is no such festival" may not reasonably be construed as jokes. The statements implied that Kolegas was deliberately attempting to induce the Disas and the audience into believing that a fictitious event would occur.

The defendants further urge that the statements merely suggested that Kolegas was jokingly advertising a fictitious event. Even if we accepted this construction, however, it would not remove the statements from the category of defamatory *per se*. A statement which implies that a professional promoter is promoting a fictitious event undermines the promoter's credibility with the public and thereby damages his professional reputation. See *Brown & Williamson Tobacco Corp. v. Jacobson* (7th Cir. 1987), 827 F.2d 1119 (libelous television news broadcast which led viewers to believe that a cigarette manufacturer had deliberately adopted an advertising policy designed to start children smoking and to associate smoking with pleasurable illicit activity prejudiced the manufacturer in its trade or business in a manner that was so obviously and naturally injurious that proof of the injurious character of the material was not required).

The defendants also claim that the statements may be construed innocently because Tim Disa recanted his statement that there was no festival and acknowledged that the festival might take place. The defendants rely

upon Tim Disa's comment that "[i]f he [Kolegas] is producing it [the festival], he's only producing it part-time. The rest of the time he's too busy picking out their wardrobe. You know, he has to make sure that they have the large hats to cover their big heads and make sure that all of their collars are big enough." This statement, the defendants claim, acknowledges that there may be a show and negates any denial of the show's existence.

Viewed in context, however, Tim Disa's comment cannot reasonably be construed as a retraction of his prior statement that there was no such show as the classic cartoon festival. Rather, his comment simply reflects another attempt to ridicule Kolegas and his discussion of the festival. Taken together with all of the prior remarks, Tim Disa's statement reinforced the preceding implication that Kolegas and the festival were frauds.

We conclude that the Disas' statements are defamatory *per se,* because they fall within two *per se* categories, in that they imputed that Kolegas lacked integrity in carrying out his professional duties and prejudiced Kolegas in his business, and because those statements are not reasonably susceptible to an innocent construction.

## B. *First Amendment*

The defendants also contend that count I was properly dismissed because the Disas' statements are protected by the first amendment. According to the defendants, the Disas' statements cannot reasonably be construed as factual assertions. The United States Supreme Court recently held that statements which do not contain factual assertions are protected under the first amendment and may not be the basis of a defamation action. (*Milkovich v. Lorain Journal Co.* (1990), 497 U.S. 1, 19, 111 L. Ed. 2d 1, 18, 110 S. Ct. 2695, 2706.) The test to determine whether a defamatory statement is constitutionally protected is a restrictive one; only

those statements that *"cannot* 'reasonably [be] interpreted as stating actual facts' " are protected under the first amendment. (Emphasis added.) *Milkovich v. Lorain Journal Co.* (1990), 497 U.S. 1, 20, 111 L. Ed. 2d 1, 19, 110 S. Ct. 2695, 2706, quoting *Hustler Magazine v. Falwell* (1988), 485 U.S. 46, 50, 99 L. Ed. 2d 41, 48, 108 S. Ct. 876, 879.

We find that the Disas' statements that Kolegas was "not for real," was "scamming" them, and that there was "no such show as the classic cartoon festival" are not entitled to constitutional protection. Those statements *can* reasonably be construed as asserting facts, namely, that Kolegas was lying and that no festival would take place.

The defendants claim, however, that the statements cannot reasonably be construed as factual assertions because they constituted mere "imaginative expression" or "rhetorical hyperbole." We disagree. The United States Supreme Court has characterized language as "rhetorical hyperbole" only when that language, in context, was obviously understood as an exaggeration, rather than a statement of literal fact. *Greenbelt Cooperative Publishing Association, Inc. v. Bresler* (1970), 398 U.S. 6, 26 L. Ed. 2d 6, 90 S. Ct. 1537 (in context, the word "blackmail" referred, not to a criminal act, but to unreasonable negotiating practices); *Old Dominion Branch No. 496 v. Austin* (1974), 418 U.S. 264, 284-86, 41 L. Ed. 2d 745, 761-63, 94 S. Ct. 2770, 2781-82 (characterization of union "scab" as a "traitor" was understood to mean that the plaintiffs' actions were reprehensible, not that plaintiffs had committed treason).

Here, however, the Disas' statements that Kolegas was "not for real," was "scamming" them, and that there was "no such show as the classic cartoon festival" were obviously intended to be taken literally. The Disas did not use the sort of loose, imaginative or hyperbolic

language that would negate the impression that they were seriously maintaining that Kolegas was lying and that no festival would occur. Nor do we believe the tenor of the show negated that impression. On the contrary, those who heard the defamatory remarks may have been more likely to interpret those remarks literally or seriously, because the statements were made immediately after the advertisement promoting the festival was aired. The audience generally expects radio talk show hosts to be very solicitous of advertisers. Listeners may have concluded that the Disas would never jokingly say that an event was a "scam" and would not actually take place, when that event was advertised on WLUP immediately before the defamatory comments were made.

The fact that the Disas may have "meant" the comments as jokes, rather than as factual assertions, is inapposite. A defendant cannot escape liability for defamatory factual assertions simply by claiming that the statements were a form of ridicule, humor or sarcasm. (See *Milkovich*, 497 U.S. at 18, 111 L. Ed. 2d at 18, 110 S. Ct. at 2706 (defendant cannot avoid liability for defamation simply by prefacing defamatory factual assertions with the words "I think" or "In my opinion").) We cannot assume that those who heard the remarks were familiar with the Disas' brand of humor or attuned to their wit. The clear import of the Disas' "jokes" was that Kolegas was lying and that the festival he was promoting would not actually take place. We conclude that an average listener could have interpreted such remarks as defamatory statements of fact. Whether the remarks were actually understood as harmless jokes or as defamatory statements is for the trier of fact to determine.

We therefore hold that count I of the plaintiff's complaint states a cause of action for defamation. The facts alleged, if proved at trial, could support a finding that the Disas' statements were defamatory.

## II. False Light

We next consider whether count III of the plaintiffs' complaint adequately states a cause of action for invasion of privacy in the form of publicity placing another in a false light. This count, which was brought in the names of Anthony, Donna and Christopher Kolegas, alleges that the Disas made statements which placed the plaintiffs in a false light before the public. The statements are as follows. Tim Disa stated, "Why would someone marry a woman if she had Elephant Man disease? It's not like he couldn't tell—unless it was a shotgun wedding." Beth Disa replied that it must have been a shotgun wedding. Tim Disa then added, "If he is producing it [the festival], he's only producing it part-time. The rest of the time he's too busy picking out their wardrobe. You know, he has to make sure they have large hats to cover their big heads and make sure that all of their collars are big enough to fit." Beth Disa indicated her agreement. The plaintiffs allege that these statements placed them before the public in a false light because they implied that Anthony and Donna Kolegas were married in a shotgun wedding and that Donna and Christopher Kolegas had abnormally large heads.

In *Lovgren v. Citizens First National Bank* (1989), 126 Ill. 2d 411, this court set forth the three elements necessary to state a cause of action for false light. First, the allegations in the complaint must show that the plaintiffs were placed in a false light before the public as a result of the defendants' actions. Second, the court must determine whether a trier of fact could decide that the false light in which the plaintiffs were placed would be highly offensive to a reasonable person. Finally, the plaintiffs must allege and prove that the defendants acted with actual malice, that is, with knowledge that the statements were false or with reckless disregard for

whether the statements were true or false. (*Lovgren,* 126 Ill. 2d at 419-23.) The purpose underlying the false light cause of action is to define and protect an area within which every citizen must be left alone. *Lovgren,* 126 Ill. 2d at 420, quoting *Leopold v. Levin* (1970), 45 Ill. 2d 434, 440.

Accepting the allegations in count III of the plaintiffs' complaint as true, we conclude that the plaintiffs have adequately stated a cause of action for false light. The complaint clearly satisfies the first element of this tort. The Disas' statements cast the plaintiffs in a false light in two respects. First, they stated that Anthony and Donna must have been married in a "shotgun wedding," when, according to the complaint, they were not. Second, they implied that Donna and Christopher Kolegas had abnormally large heads as a result of their disease, when, according to the complaint, their heads were not of abnormal size. The complaint also alleges that the defendants publicized the matter by broadcasting the Disas' statements on WLUP in Du Page County and other counties throughout the State. Thus, the complaint adequately alleges that the plaintiffs were placed in a false light before the public as a result of the defendants' actions.

The defendants claim, however, that the first element is not satisfied here, because the false light in which the plaintiffs were placed was not the result of the *defendants'* actions. They claim that Kolegas invited and consented to the Disas' comments when he publicly announced that his family suffered from neurofibromatosis. They claim that the Disas never would have made the offending remarks if Kolegas had not called WLUP.

We categorically reject the defendants' implication that Kolegas waived any expectation of privacy when he called WLUP or when he truthfully acknowledged his family's disease. Kolegas' public statement that his wife

and son were afflicted with the disease did not automatically give the defendants the right to make or broadcast statements depicting the plaintiffs in a false light. The false light in which the plaintiffs were portrayed to the public was clearly the result of the defendants' actions.

We further find that count III of the plaintiffs' complaint satisfies the second element required to state a cause of action for false light. As stated, this element requires the court to determine whether a finder of fact could decide that the false light in which the plaintiffs were placed would be highly offensive to a reasonable person. This element is met " 'when the defendant knows that the plaintiff, as a reasonable man, would be justified in the eyes of the community in feeling seriously offended and aggrieved by the publicity.' " (*Lovgren*, 126 Ill. 2d at 420, quoting Restatement (Second) of Torts §652E, Comment *c*, at 396 (1977).) Here, the defendants falsely implied that Donna and Christopher Kolegas' heads were deformed as a result of their illness, and that Donna was so physically unattractive as a result of the disease that Anthony would not have married her except in a shotgun wedding. A reasonable trier of fact could conclude that the defendants knew that the plaintiffs would be highly offended by publicity which placed them in such a false light. We cannot find, as a matter of law, that the Disas' statements would offend only a hypersensitive individual.

The false light in which the plaintiffs here were placed was arguably much more offensive than that at issue in *Lovgren*. In *Lovgren*, the defendant falsely disparaged the plaintiff's financial integrity before the public by placing notices in a local newspaper which indicated that the plaintiff was selling his farm in a public auction. In reality, the plaintiff had no intention of selling his farm. This court concluded that defendant's actions placed the plaintiff in a false light before the

public and that a reasonable trier of fact could conclude that the defendant knew that publication of this false fact would prove highly offensive to the plaintiff. (*Lovgren*, 126 Ill. 2d at 420.) If the statements in *Lovgren* could support a cause of action for false light, the same must be said for the statements here.

Finally, we find that the plaintiff's complaint satisfies the third element of the tort of false light. The complaint alleges that the defendants made and broadcast the false statements with knowledge of their falsity or in reckless disregard for their truth or falsity. Taking these allegations as true, as we are required to do for purposes of our review, we conclude that count III of the complaint adequately states a cause of action for invasion of privacy by placing the plaintiffs before the public in a false light.

### III. Emotional Distress

We finally consider whether count IV of the plaintiff's complaint states a cause of action for reckless infliction of emotional distress. That count was brought in the names of all three of the plaintiffs and involves the same statements underlying the false light count.

In *McGrath v. Fahey* (1988), 126 Ill. 2d 78, this court set forth the three elements necessary to state a cause of action for reckless infliction of emotional distress. The plaintiff must plead facts which indicate: (1) that the defendant's conduct was extreme and outrageous; (2) that the defendant knew that there was a high probability that his conduct would cause severe emotional distress; and (3) that the conduct in fact caused severe emotional distress. *McGrath*, 126 Ill. 2d at 86, citing *Public Finance Corp. v. Davis* (1976), 66 Ill. 2d 85, 90.

We first consider whether the plaintiffs' complaint satisfies the "outrageousness" requirement. It is clear that " 'mere insults, indignities, threats, annoyances,

petty oppressions or other trivialities' " do not qualify as outrageous conduct. (*McGrath*, 126 Ill. 2d at 86, quoting Restatement (Second) of Torts §46, Comment *d*, at 73 (1965).) Rather, the nature of the defendant's conduct must be so extreme as to go beyond all possible bounds of decency, and to be regarded as intolerable in a civilized community. Restatement (Second) of Torts §46, Comment *d*, at 73 (1965) ("recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous!' ").

The *McGrath* court identified several factors that should be considered in determining whether a defendant's conduct may be deemed outrageous. For example, the court observed that the extreme and outrageous nature of the conduct may arise from the defendant's abuse of some position which gives him actual or apparent authority over the plaintiff or the power to affect the plaintiff's interests. (*McGrath*, 126 Ill. 2d at 86-87.) Another factor to be considered is the defendant's awareness that the plaintiff is particularly susceptible to emotional distress, because of some physical or mental condition or peculiarity. Behavior that might otherwise be considered merely rude, abrasive or inconsiderate, may be deemed outrageous if the defendant knows that the plaintiff is particularly susceptible to emotional distress. *McGrath*, 126 Ill. 2d at 88.

Bearing these considerations in mind, we consider whether the plaintiffs have adequately alleged extreme and outrageous conduct. We find particularly significant the background against which the Disas' comments were made. Kolegas had paid WLUP to advertise the classic cartoon festival. The advertisement promoting the festival was aired during the Disas' show. Shortly thereafter, Kolegas telephoned WLUP, reasonably expecting the Disas to be a receptive audience because of the preced-

ing advertisement. Kolegas called, not to be ridiculed or to have his family ridiculed, but to promote the festival he had paid WLUP to advertise, and to encourage the listening audience to assist in the fight against neurofibromatosis by attending the festival. Kolegas revealed his wife and child's condition within the context of this discussion, and in response to the Disas' inquiry.

The Disas responded to Kolegas' truthful statements by implying that Kolegas' wife was so hideous that no one would marry her except under duress. The Disas also broadcast statements implying that Kolegas' wife and five-year-old child had deformed heads. Had these comments been expressed privately, we might be more inclined to consider them "mere insults." Here, however, the Disas broadcast their derogatory remarks on the radio throughout the Chicago metropolitan area and outlying counties. We agree with the plaintiffs that conduct that is trivial between private parties may become extreme and outrageous by virtue of its publication to the community at large.

Moreover, as previously noted, the extreme and outrageous character of a defendant's conduct may arise, not so much from what he says or does, but from the defendant's improper use of a position of power which gives him the ability to adversely affect the plaintiff's interests. The Disas had access to channels of communication; the power of the media cannot be denied. More importantly, the plaintiffs had no similar access to the public, because the Disas terminated their conversation with Kolegas before making their false and offensive remarks, and thereby deprived him of the opportunity to deny or rebut their false statements. Although past cases have generally involved abuse of power by employers, creditors or financial institutions (see, *e.g., McGrath v. Fahey* (1988), 126 Ill. 2d 78, 86-89 (and cases cited therein)), we see no reason to exclude the defendants at

issue here from the many types of individuals who may be positioned to exercise power over a plaintiff.

It is also reasonable to infer that the Disas knew that the plaintiffs would be particularly susceptible to emotional distress. Kolegas informed the Disas that his wife and child were afflicted with neurofibromatosis. The Disas also knew that Kolegas was producing a festival to promote public awareness of the disease. It is reasonable to infer from these well-pleaded facts that the defendants knew that the plaintiffs would be peculiarly susceptible to emotional distress caused by comments which implied that they were hideous and deformed as a result of their disease. (See *Wall v. Pecaro* (1990), 204 Ill. App. 3d 362 (doctor who urgently recommended that patient submit to unwarranted surgical removal of significant portions of her mouth and abortion of her viable fetus knew that patient was particularly susceptible to emotional distress by reason of her pregnancy).) We find that a reasonable trier of fact could easily conclude that the Disas' conduct was so outrageous as to be regarded as intolerable in a civilized community.

The defendants argue that the Disas' remarks, though infantile and offensive, should be characterized as "mere insults" or "slight hurts which are the price of a complex society." They rely upon this court's decision in *Public Finance Corp. v. Davis* (1976), 66 Ill. 2d 85, as authority for their claim that the Disas' behavior cannot be characterized as "outrageous." *Public Finance*, however, is distinguishable. *Public Finance* was a debt-collection case, in which the defendant tried to collect money owed by the plaintiff by calling her repeatedly, visiting her home, using her phone to describe the condition of her household goods, and informing others that the plaintiff wrote bad checks. In holding that the defendant's conduct fell short of that necessary to state a cause of action for intentional infliction of emotional

distress, the court in *Public Finance* noted that the defendant could not assert his legal rights without causing a certain amount of embarrassment and distress to the plaintiff. This court determined that a creditor must be given some latitude to pursue reasonable methods of collecting debts, even though such methods may inconvenience and annoy the debtor. (*Public Finance*, 66 Ill. 2d at 91-92.) Obviously, the defendants' conduct in this case cannot be equated with that at issue in *Public Finance*. A radio talk show host's interest in ridiculing another for the purported amusement of the audience is not entitled to the same type of legal deference given to a creditor's legitimate interest in collecting a debt.

We further find that the plaintiff's complaint adequately pleads the second and third elements necessary to state a cause of action for reckless infliction of emotional distress. Count IV of the complaint alleges that the defendants' conduct, in making and broadcasting the statements, "was done with reckless disregard of the probability of causing emotional distress" to the plaintiffs and that the plaintiffs suffered severe emotional distress as a proximate result of the defendants' conduct.

As previously stated, in evaluating a motion to dismiss brought pursuant to section 2—615 (Ill. Rev. Stat. 1989, ch. 110, par. 2—615), all well-pleaded facts in the complaint will be regarded as true. According to the allegations in the complaint, the defendants knew that Donna and Christopher Kolegas had neurofibromatosis and nevertheless made false and highly offensive comments regarding the effects of the disease upon their personal appearance. A jury could reasonably find that the defendants knew that there was a high probability that their conduct would cause emotional distress.

The defendants complain, however, that the allegation that the plaintiffs suffered severe emotional distress is conclusory. They argue that "objectively measured, the

[plaintiffs'] emotional distress was not severe." It is impossible for us to "objectively measure" the severity of the plaintiffs' emotional distress, since neither party has offered any evidence regarding the extent of the emotional distress sustained. It is clear, however, that such evidence is not necessary or appropriate at this stage, since we are only evaluating the sufficiency of the pleadings. The plaintiffs' complaint alleges that the defendants' conduct was extreme and outrageous. The facts alleged in support of the outrageous character of the defendants' conduct are sufficient to support the additional allegation that the plaintiffs suffered severe emotional distress as a result of that conduct. (See Restatement (Second) of Torts §46, Comment *j*, at 77-78 (1965) ("Severe emotional distress must be proved; but in many cases the extreme and outrageous character of the defendant's conduct is in itself important evidence that the distress has existed").) Thus, the plaintiffs' complaint satisfies the third element necessary to support an emotional distress claim. Accepting the allegations in count IV as true, we find that the plaintiffs' complaint adequately states a cause of action for reckless infliction of emotional distress.

## IV. Conclusion

Accordingly, we affirm that portion of the appellate court decision which upheld count I of the complaint and reverse that portion of the decision which affirmed the dismissal of counts III and IV of the complaint. We, of course, express no opinion on the substantive merits of counts I, III, and IV of the plaintiffs' complaint. We simply hold that those counts are sufficient to survive a motion to dismiss. For the reasons stated, the judgment of the appellate court is affirmed in part and reversed in part, the judgment of the circuit court is reversed, and

this cause is remanded to the circuit court for further proceedings consistent with this decision.

*Appellate court affirmed in part and reversed in part; circuit court reversed; cause remanded.*

JUSTICE FREEMAN, specially concurring:

I agree with the conclusion reached in this case. I write separately to record my concerns with the majority's analysis in part III respecting the allegations of reckless infliction of emotional distress.

The linchpin of the conclusion that the element of extreme and outrageous conduct was satisfied by the complaint's allegations is the fact that the Disas were able to unilaterally broadcast their remarks. (154 Ill. 2d at 22.) The majority finds that the considerable public reach permitted by the positions the Disas enjoyed in the media transformed the offensive remarks into extreme and outrageous conduct. (154 Ill. 2d at 22-23.) Were the same remarks made privately, the majority reservedly observes, "we might be more inclined to consider them 'mere insults.' " 154 Ill. 2d at 22.

The majority's observation points to a potential problem for similar cases in the future. With introduction of the concept of an audience in the determination of whether remarks constitute extreme and outrageous conduct, it may seem to matter little that what is said may be merely insulting. It is difficult to separate the content from the circumstances of any unwelcome remarks broadcasted publicly. The more extensive that broadcast the more extreme and outrageous the remarks, otherwise nonactionable if made privately, appear. That may invite a less than rigorous analysis of the content of what is broadcast.

Comment *e* of section 46 of the Restatement of Torts (Restatement (Second) of Torts §46 (1965)) cautions that, where the conduct is associated with abuse of a position of power, liability generally has not been recognized for mere insults. (Restatement (Second) of Torts §46, Comment *e*, at 74 (1965).) When evaluating a complaint's allegations pursuant to a section 2—615 motion, it is essential that the public nature of the objected-to remarks does not overshadow a critical analysis of their content.

Although the majority expresses some reservation, I believe such an analysis shows the alleged remarks to be something more than mere insults. Tim and Beth Disa's comments are easily characterized as hurtful, unfeeling, and cruel. The remarks evidence a plain ignorance of and disregard for the condition afflicting Donna and Christopher Kolegas. Neurofibromatosis—Elephant man disease—conjures images of grotesque physical deformity. It would certainly be an unfortunate state of affairs if such ridicule about a woman and child afflicted with the disease did not generate resentment against the Disas sufficient to cause an average member of the community to exclaim, "Outrageous!"