MICHAEL P. GREEN, Plaintiff-Appellant, v. TRINITY INTERNATIONAL UNIVERSITY *et al.*, Defendants-Appellees.

Second District No. 2—02—1208

Opinion filed December 19, 2003.

Mark J. Smith, Jerry P. Clousson, Melissa Dakich, and Ryan S. Kosztya, all of Lowis & Gellen, of Chicago, for appellant.

Ralph A. Morris, of Schiff, Hardin & Waite, of Chicago, and Charlene Q. Kalebic, of Schiff, Hardin & Waite, of Lake Forest, for appellees.

JUSTICE BOWMAN delivered the opinion of the court:

Plaintiff, Michael P. Green, Ph.D., filed suit against defendants, Trinity International University (the University), Barry Beitzel, Ph.D., and Harold Netland, Ph.D., alleging breach of contract, invasion of privacy, and defamation stemming from the termination of his employment with the University. Defendants moved to dismiss plaintiff's first amended complaint pursuant to sections 2—615 and 2—619 of the Code of Civil Procedure (Code) (735 ILCS 5/2—615, 2—619 (West 2002)). The trial court dismissed the first amended complaint in its entirety, with prejudice. Plaintiff appeals, arguing that (1) the trial court improperly considered factual defenses when evaluating the sufficiency of his allegations, and (2) he sufficiently pleaded the elements of breach of contract, invasion of privacy, and defamation. We affirm in part, reverse in part, and remand.

The first amended complaint alleges that plaintiff first became employed as an associate professor with the University, a divinity school, in March 1995. In addition to his duties as an associate professor, he also held the position of "Director of Supervised Ministries." During the course of his employment, plaintiff entered into successive one-year written contracts with the University. The last contract between plaintiff and the University was dated March 5, 2001, and covered a 12-month period beginning July 1, 2001. On April 10, 2001, plaintiff entered into a contract with the University for the summer session, which ran from July 30, 2001, through August 17, 2001.

Plaintiff further alleges that, in 2000, he was under consideration for tenure. A committee (Committee) comprising members of the faculty senate was appointed to evaluate his tenure application. According to plaintiff, on November 8, 2000, he met with Beitzel, who was the University provost, and Netland, the academic dean of the divinity school. At that meeting, Beitzel and Netland informed plaintiff for the first time that some students had criticized how he conducted his classes. Then, on January 17, 2001, the faculty senate instructed the Committee to investigate the criticisms by questioning randomly selected students about plaintiff's classroom decorum. Plaintiff alleges that he was to have no input with respect to any part of this process, which was not part of the tenure process set forth in the faculty handbook (Handbook). Plaintiff's tenure review process was then extended to "not later than autumn 2001."

Plaintiff further alleges that his agreement to extend the tenure review process was contingent upon an agreement with University administration that, if he were denied tenure, the University would provide him with a one-year employment contract for the 2002-03 school year. Plaintiff alleges that all members of the administration "were in accord" with him on this issue.

Subsequently, the Committee sought plaintiff's permission to interview students. The Committee informed plaintiff that the tenure review process would end if he withheld his permission. Plaintiff refused to give his permission and, on April 19, 2001, he was informed by letter that the faculty senate had denied his application for tenure. On April 24, 2001, plaintiff received a memorandum from Beitzel informing him that his employment contract would not be renewed for the 2002-03 school year.

In count I of the first amended complaint, plaintiff claims that the University breached its contract with him by suspending him from the duties outlined in the 2001-02 written contract, cancelling his 2001 summer class, failing to notify him in a timely manner of the intention not to renew his contract for 2002-03, and failing to follow the guidelines set forth in the Handbook.

In count II, plaintiff alleges invasion of privacy in the form of publicity placing him in a false light. This claim is based on statements contained in three memoranda authored by Netland, which were distributed to University faculty, staff, and students in August 2001. The statements said that plaintiff "has been relieved of his responsibilities as Director of Supervised Ministries, including classroom instruction and advisee group." Plaintiff alleges that, by failing to explain the circumstances behind the termination, defendants communicated the false impression that plaintiff had committed acts of moral turpitude. Plaintiff relies on sections of the faculty constitution which state that, except in cases of moral turpitude, notice that an employment contract will not be renewed is to be given by March 1 of the terminal year. Plaintiff further claims that it was University practice to ask for prayers for individuals involved in personnel changes. According to plaintiff, the omission of such a request from the announcement of his termination also communicated that he had committed acts of moral turpitude. Plaintiff further alleges that the University's acts and communications were performed maliciously for the purposes of placing him in disrepute among his peers.

Count III of the first amended complaint alleges defamation *per se*, based on statements made by Beitzel in a letter dated November 30, 2001, to Dr. Martin D. Snyder, associate secretary of the American Association of University Professors (AAUP). Beitzel wrote the letter

in response to a letter from Snyder expressing concern about how the University handled plaintiff's tenure application. Snyder had become involved in the situation at plaintiff's request. Beitzel copied several other individuals on the letter, including Gregory Waybright, University president; W. Charles Thor, Jr., chair of the University's board of regents; Netland; Daniel O. Aleshire, executive director of the Association of Theological Schools; and Mary Breslin, associate director of the North Central Association of Colleges and Schools. Plaintiff was also copied on the letter.

Plaintiff sets forth 10 statements that he alleges were false and injured his professional reputation as a teacher and clergyman. To summarize, the statements indicated that several students reported concerns that plaintiff was "rude, abrasive, and even acerbic" in class, devoted a large amount of class time to noncourse considerations, and was unprofessionally candid with students about matters not directly related to class materials. Beitzel added that, "if true," some of the statements plaintiff made were "shocking, extremely bothersome, and there is one that I believe borders on prejudice." Beitzel's letter also indicated that some students had tried to discuss these issues with plaintiff directly, but they did not feel that plaintiff was responsive to them. In addition, Beitzel stated that University administrators had discussed these concerns with plaintiff on multiple occasions between 1998 and 2000. Beitzel said that on one such occasion one of the University deans told plaintiff that if the University had to deal with this type of concern once more, plaintiff was "out of here." Plaintiff alleges that the University, through Beitzel, made these statements with the intent to injure his reputation or with reckless disregard of the consequences that might result from them.

In a combined motion to dismiss, defendants argued, pursuant to section 2—615 of the Code, that plaintiff failed to state a cause of action under any of his theories. Further, pursuant to section 2—619 of the Code, defendants asserted that count III should be dismissed because a qualified privilege applied to the allegedly defamatory statements. The trial court agreed with defendants, dismissing all counts of the first amended complaint with prejudice. Plaintiff filed a timely notice of appeal from the trial court's order.

## ANALYSIS

■ A motion pursuant to section 2—615 attacks the legal sufficiency of a complaint. *Provenzale v. Forister*, 318 Ill. App. 3d 869, 878 (2001). Such a motion admits as true all well-pleaded facts, but not conclusions of law or factual conclusions that are unsupported by allegations of specific facts. *Provenzale*, 318 Ill. App. 3d at 878. When

deciding a section 2—615 motion, the court must determine whether the allegations of the complaint, viewed in the light most favorable to the plaintiff, are sufficient to state a cause of action upon which relief may be granted. *Abbasi v. Paraskevoulakos*, 187 Ill. 2d 386, 391 (1999). A cause of action will not be dismissed on the pleadings unless it clearly appears that the plaintiff would not be entitled to relief under any set of facts. *Abbasi*, 187 Ill. 2d at 391.

■ A motion to dismiss pursuant to section 2—619(a)(9), on the other hand, raises an "affirmative matter avoiding the legal effect of or defeating the claim" (735 ILCS 5/2—619(a)(9) (West 2002)). Such a motion "is properly used to raise affirmative matters that negate the claim, not to challenge the essential allegations of the plaintiff's cause of action." *Provenzale*, 318 Ill. App. 3d at 878. We review *de novo* the dismissal of a complaint pursuant to either section 2—615 or section 2—619. *Krilich v. American National Bank & Trust Co. of Chicago*, 334 Ill. App. 3d 563, 571 (2002).

## BREACH OF CONTRACT

■ The elements of a cause of action for breach of contract include: (1) an offer and acceptance, (2) consideration, (3) definite and certain contractual terms, (4) the plaintiff's performance of his contractual obligations, (5) the defendant's breach of the contract, and (6) damages resulting from the breach. *Barille v. Sears Roebuck & Co.*, 289 Ill. App. 3d 171, 175 (1997). Plaintiff asserts that the University breached the 2001-02 written employment contract, the Handbook that was incorporated into the written contract, and an agreement to employ plaintiff for the 2002-03 school year. We will address each of these alleged contracts in turn.

## 2001-02 WRITTEN CONTRACT

Plaintiff alleges that the University breached the 2001-02 contract by suspending him from his academic and administrative duties. In its motion to dismiss, the University counters that plaintiff cannot state a cause of action for breach of this contract because the University paid plaintiff the full amount of his compensation and benefits. The University relies on statements Beitzel made in his letter of November 30, 2001, which is attached as an exhibit to the complaint. In ruling on the motion to dismiss, it appears that the trial court relied on the alleged payment of the contract amount as the basis for its ruling that plaintiff failed to state a cause of action as to the 2001-02 contract. The court stated as follows:

> "In this particular case there was a buyout *** by the University of Green's one year contract for the academic year, '01/02, and for the summer employment year—corresponded to the summer employment year.

The—Green contends that there are other benefits that should have accrued to him. For example, the opportunity or right, if you will, to continue teaching, that sort of thing.

I do not find that as part of the contract. All benefits have been conferred by the contract. If anything, Green owed the obligation back to the University to perform at his end. He could claim he was prevented to perform, but even if he does, there are no damages of any nature because he has essentially had the buyout provisions extended, the University states that it has paid or [is] fully prepared to pay everything under that contract, and I find no breach as to that."

■ As we stated in *Provenzale*, when presenting a hybrid motion to dismiss it is improper to submit evidentiary material going to the truth of the allegations contained in the complaint because a motion pursuant to either section 2—615 or 2—619 concedes the truth of all well-pleaded allegations. *Provenzale*, 318 Ill. App. 3d at 879. A court may not consider depositions, affidavits, or other supporting materials when ruling on a section 2—615 motion. *Provenzale*, 318 Ill. App. 3d at 879. Moreover, a party may not submit evidentiary material in support of a section 2—619 motion for the purpose of contradicting well-pleaded facts in the complaint. *Provenzale*, 318 Ill. App. 3d at 879. By introducing evidence pertaining to the alleged payment of amounts due to plaintiff pursuant to the 2001-02 contract, the University improperly presented evidentiary material going to the truth of the allegations contained in the complaint. The trial court incorrectly considered and relied on this evidence.

■ The University contends that payment on the contract is a valid basis for dismissing the breach of contract count pursuant to section 2—619. This argument fails for two reasons. First, the University did not raise it below. It moved to dismiss count I of the first amended complaint, which contained the breach of contract claims, under section 2—615 only. It is improper for the University to assert a new theory for the first time on appeal. See *Carter v. Dunlop*, 138 Ill. App. 3d 58, 60 (1985). The University's contention that its entire motion to dismiss was brought pursuant to both section 2—615 and section 2—619 is disingenuous and belied by the motion itself. Second, even if the payment argument were properly before the court, the letter upon which the University relies does not provide a sufficient factual basis to establish its defense. Section 2—619(a) states that "[i]f the grounds [for such a motion] do not appear on the face of the pleading attacked the motion shall be supported by affidavit." 735 ILCS 5/2—619(a) (West 2002). The University contends that, because the Beitzel letter indicating that plaintiff was paid the full contract amount was at-

tached as an exhibit to the first amended complaint, plaintiff cannot now assert that the statements were untrue. This argument fails, however, because the exhibit was attached in support of plaintiff's defamation claim, to demonstrate the allegedly defamatory statements published by Beitzel. Plaintiff never admitted the allegations contained in the letter. Rather, he alleged that the statements in the letter were false. Further, the University's argument that plaintiff has never contested its assertion that he has been paid the full contractual amount is irrelevant. Plaintiff is not required to contest facts at this stage of the proceedings. This is not a summary judgment motion, but a motion to dismiss in which all well-pleaded facts are taken as true. Accordingly, we hold that it was error for the court to dismiss plaintiff's breach of contract claim based on the defense of payment.

This error notwithstanding, plaintiff has not properly alleged a breach. He merely alleges that he was suspended from his duties, not that he was suspended without pay. If plaintiff has in fact been fully compensated, we fail to see how the University could have breached its contractual obligation or how plaintiff could have suffered any damage. Plaintiff cannot avoid the effect of payment by simply omitting any mention of it from the complaint. However, because the University has not properly raised payment as an affirmative defense (see 735 ILCS 5/2—613(d), 2—619(a) (West 2002)), we cannot say at this point that plaintiff would not be entitled to relief under any set of facts. Therefore, we remand to give plaintiff an opportunity, if the facts warrant, to amend the portion of count I pertaining to the 2001-02 contract. We further note that while plaintiff requests $80,000 in his prayer for relief, nothing in the first amended complaint alleges how he was damaged as a result of the alleged breach. Any amendment would have to address this deficiency as well.

## FACULTY HANDBOOK

Plaintiff alleges that, as part of his tenure application, the faculty senate (Senate) directed the Committee to interview arbitrarily selected students about plaintiff's classroom decorum. Plaintiff further alleges that this constituted an improper modification of the tenure process set forth in the Handbook. The trial court determined, and the parties agree, that the Handbook is part of the University's written contract with plaintiff.

The Handbook incorporates the faculty constitution, which states as follows with respect to the tenure interview procedure:

> "Each applicant will be thoroughly and seriously interviewed by a subcommittee of the Senate (appointed by the Dean) on the following four areas. It is suggested that the committee assign one (or

more) of each of these four areas to each committee member and that the committee member prior to the meeting construct a list of basic questions in his or her assigned area to ask the candidate.

After the subcommittee has (1) viewed the video tape of a recent class lecture and (2) met with the candidate for a time of serious questioning, they shall go into executive session to prepare a confidential one- or two-page summary (suitable for sharing with the Senate and ultimately the Board of Directors). The summary should be placed in the faculty personnel file in the Dean's Office.

The four areas for the interview are:

1. Personal Christian Life.

\* \* \*

2. Theological acuteness.

\* \* \*

3. Teaching effectiveness.

 a. Mastery of one's own subject matter and discipline of instruction.

 b. Openness to students' questions and needs, including gender, racial, and ethnic sensitivity.

 c. Syllabus design, integrity, and educational outcomes.

 d. Effectiveness in lecture delivery and use of educational audio-visual to illustrate lectures.

 e. Effectiveness of testing, grading, and assignment skills.

 f. Breadth of vision for theological education and the other disciplines and departments of the Divinity School.

4. Institutional effectiveness and depth of commitment to Trinity's philosophy of ministry and its future.

 a. Regular participation in the community life of the Divinity School: such as chapel, faculty prayers, faculty committees, faculty meetings and such additional assignments as may be requested from time to time.

 b. Openness and skills in advising and counseling students (regular hours, effective advisee group on Thursdays, knowledge of catalog, evidence of pastoral concern for spiritual formation in students).

 c. Evidence of enthusiasm for the seminary's philosophy of education and ministry.

 d. Shares a global vision for the future growth of Christ's Church around the world, in the United States, in the Evangelical Free Church of America and on our campus."

According to the faculty constitution, the Senate consists of all tenured full professors. "It serves as a legislative body making recommendations to the Board of Regents through the Academic Dean. It is particularly concerned with these recommendations: sabbaticals,

leaves with pay, leaves without pay, Overseas Residence and Disciple-ship (ORD); Parish Residency Orientation (PRO), recommendations for advancement in rank, *recommendations for tenure*, and questions of dismissal of tenured faculty." (Emphasis added.)

■ The Handbook's description of the Senate's powers is quite general. Given the broad nature of the Senate's authority and the fact that the faculty constitution lists "recommendations for tenure" as one of the Senate's particular concerns, we believe that the Senate's recommendation regarding student interviews falls under the umbrella of the Senate's legislative powers. Plaintiff has not alleged any facts that support his contention that the Senate lacked such authority. For this reason, plaintiff cannot state a cause of action for violation of the Handbook.

## 2002-03 CONTRACT

■ Plaintiff also alleges that he and the University agreed that, because the tenure review process was extended into the fall of 2001, his last contract would be for the 2002-03 school year in the event he was denied tenure. Plaintiff asserts that the University breached the 2002-03 contract by terminating him on April 24, 2001. In our view, the crux of plaintiff's argument is that the University breached its promise to offer him continued employment, not that the University breached the 2002-03 contract itself. There is no written 2002-03 contract, and plaintiff has not set forth any terms of the alleged agree-ment that would allow us to conclude that the parties entered into a binding employment contract for 2002-03.

Moreover, we find untenable plaintiff's reliance upon the Handbook as the basis of the alleged breach of the agreement pertaining to the 2002-03 school year. According to plaintiff, the University's breach arises from its failure to notify him of his termination in a timely manner, as required by the Handbook. The Handbook states that "The failure of the administration to issue a new contract by March 1 of the preceding school year will amount to notice of discontinuance of the teacher's services." Thus, plaintiff contends that the University was required to notify him by March 1, 2001, if it did not intend to renew its contract with him for the 2002-03 school year. The University responds that it was not required to provide plaintiff with notice and, even if it were, it was not required to do so until March 1, 2002.

Unlike the parties, we do not presume that the Handbook applies to the alleged agreement regarding the 2002-03 school year. In order to state a cause of action for breach arising from failure to comply with the Handbook, plaintiff must allege facts demonstrating that the

Handbook created binding contractual rights. See *Hentosh v. Herman M. Finch University of Health Sciences/The Chicago Medical School*, 314 Ill. App. 3d 1009, 1011 (2000). The following traditional requirements of contract formation must be met: (1) the language of the policy statement must contain a promise clear enough that the employee would reasonably believe that an offer has been made; (2) the statement must be disseminated to the employee in such a manner that he is aware of its contents and reasonably believes it to be an offer; and (3) the employee must accept the offer by commencing or continuing to work after learning of the policy statement. *Duldulao v. St. Mary of Nazareth Hospital Center*, 115 Ill. 2d 482, 490 (1987). While plaintiff alleged facts pertaining to the Handbook's incorporation into his written contracts with the University, he has not done so with respect to the alleged 2002-03 agreement. In fact, he has not alleged any details whatsoever regarding the terms of this alleged agreement. We will not presume that the Handbook was part of the alleged 2002-03 agreement merely because it had been a part of the previous written contracts between the parties.

Thus, there is no basis for plaintiff's premise that the Handbook created binding contractual rights with respect to the alleged 2002-03 agreement. Consequently, the Handbook provisions do not apply to the University's decision not to renew plaintiff's employment contract for that school year. This means that, even if there were a valid contract between the parties with respect to 2002-03, the most that can be said is that it created an at-will employment relationship (see *Hentosh*, 314 Ill. App. 3d at 1011 ("hiring and employment terms are presumptively subject to the will of the employer unless the parties specifically contract otherwise")). The University terminated this relationship on April 24, 2001, when it notified plaintiff that it would not renew his employment contract for the following school year.

## INVASION OF PRIVACY

■ Plaintiff alleges that the University's communications to students and faculty regarding his termination made it appear that he had committed an act of moral turpitude, thereby placing him in a false light. To state a claim for false-light invasion of privacy, a plaintiff must allege that (1) the plaintiff was put in a false light before the public as a result of the defendant's actions; (2) the false light would be highly offensive to a reasonable person; and (3) the defendant acted with knowledge that the statement was false or with reckless disregard for whether the statement was true or false. *Kolegas v. Heftel Broadcasting Corp.*, 154 Ill. 2d 1, 17-18 (1992).

■ We conclude that plaintiff cannot satisfy the first element of

this cause of action. The memoranda stated only that plaintiff had been relieved of his duties. As plaintiff acknowledges, these statements were true. Consequently, the statements themselves cannot be construed as false or putting plaintiff in a false light. Plaintiff maintains, however, that his cause of action arises from what the memoranda did *not* say. Specifically, he asserts that the University's "terse" statements created the impression that he was terminated because he had committed an act of moral turpitude. This argument fails for several reasons.

First, the statements are not worded in such a way that a reasonable person would conclude that plaintiff had been fired for an act of moral turpitude. The University said nothing regarding the reasons behind the termination, much less that the reason was moral turpitude. Because there is absolutely no mention of the commission of any act of moral turpitude, it would not be reasonable to draw such an inference from the statements.

Second, the bases of plaintiff's contention that the statements implied an act of moral turpitude are not persuasive. Plaintiff relies on provisions in the Handbook stating that, except in cases of moral turpitude, the University must provide written notice of the decision to terminate a tenured professor's services after at least two-thirds of the Senate have voted and affirmed the decision. Plaintiff, however, was not a tenured professor. Therefore, this provision did not apply to him and cannot have formed the basis for any invasion of privacy claim. Plaintiff also cites the provision of the Handbook stating that, with respect to a nontenured professor, the University "typically" decides not to renew a teaching contract by March 1 of the terminal year. This provision cannot be the basis of any alleged impression that plaintiff committed an act of moral turpitude because the University's statements contain no details as to when plaintiff was terminated, nor does plaintiff allege that readers of the memoranda had knowledge of the timing of his termination. Furthermore, the provision pertaining to nontenured professors says nothing about acts of moral turpitude.

Plaintiff further states that the University "could have included language *** wishing [him] well, thanking him for his previous service, or even explaining why [he] would no longer be performing his duties." While the University could have included such language, it was by no means legally obligated to do so.

In addition, plaintiff contends that the University's failure to ask the faculty and students to pray for him cast him in a false light. Plaintiff argues that it was the University's practice to request prayers for individuals involved in personnel changes. According to plaintiff, "when prayers are purposefully omitted, the message the faculty

receives is *** obvious." We disagree. Any reader who sought to assign a meaning to the lack of a request for prayers could have arrived at myriad possible explanations. Even in the context of a religiously affiliated school such as the University, it is illogical and unreasonable to conclude that the omission of a request for prayers inescapably would lead one to conclude that plaintiff committed an act of moral turpitude or a "serious breach of his duties as a minister and teacher." That being said, we express no opinion regarding plaintiff's contention that we should judge the University's statements or omissions by the standards of the religious community of which the University is a part, rather than the more general "reasonable person" standard. In light of our holding that the University's statements are not actionable under any standard, it is not necessary for us to address this issue. For the same reason, we need not address the University's argument that this issue involves an ecclesiastical controversy in which the court should not involve itself. Last, our disposition of this issue obviates the need to address the University's assertion that plaintiff was required to plead special damages to sustain his invasion of privacy claim.

## DEFAMATION

Plaintiff's final contention is that he properly stated a claim against the University for defamation *per se*. The allegedly defamatory statements were contained in a letter, authored by Beitzel, responding to an inquiry from Dr. Martin D. Snyder of the AAUP. Snyder wrote to the University at plaintiff's request and, according to plaintiff, "outlined his serious concerns pertaining to the University's handling of alleged student complaints about Green's professional performance, Green's [*sic*] denial of his application for tenure, and Green's summary suspension from all duties at the Divinity School." Beitzel's response purported to present the sequence of events that led up to the denial of tenure. Beitzel copied Daniel O. Aleshire of the Association of Theological Schools and Mary B. Breslin of the North Central Association of Colleges and Schools on the letter, in addition to plaintiff and University officials. Aleshire and Breslin had not been copied on Snyder's letter to the University.

 To state a claim for defamation, a plaintiff must allege sufficient facts to show that (1) the defendant made a false statement concerning him, (2) there was unprivileged publication to a third party through the fault of the defendant, and (3) this caused damage to the plaintiff. *Krasinski v. United Parcel Service, Inc.*, 124 Ill. 2d 483, 490 (1988). A statement is considered defamatory *per se* when its defamatory character is apparent on its face. *Kolegas*, 154 Ill. 2d at 10.

Such statements are so obviously and materially harmful that injury to the plaintiff's reputation is presumed. *Kolegas*, 154 Ill. 2d at 10. The following four categories of statements are considered defamatory *per se*: "(1) words which impute the commission of a criminal offense; (2) words that impute infection with a loathsome communicable disease; (3) words that impute an inability to perform or want of integrity in the discharge of duties of office or employment; or (4) words that prejudice a party, or impute lack of ability, in his or her trade, profession or business." *Kolegas*, 154 Ill. 2d at 10. Even if a statement falls into one of these categories, it is not defamatory *per se* if it is reasonably capable of an innocent construction. *Kolegas*, 154 Ill. 2d at 11. Courts must consider written or oral statements in context, giving the words and their implications their natural and obvious meaning. *Anderson v. Vanden Dorpel*, 172 Ill. 2d 399, 412 (1996), quoting *Chapski v. Copley Press*, 92 Ill. 2d 344, 352 (1982).

■ In addition, statements that cannot be reasonably construed as factual assertions are protected by the first amendment and may not be the basis of a defamation action. *Kolegas*, 154 Ill. 2d at 14, citing *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 19, 111 L. Ed. 2d 1, 18, 110 S. Ct. 2695, 2706 (1990). The University contends that the allegedly defamatory statements may either be innocently construed or constitute nonactionable opinion. We agree.

In his brief, plaintiff does not explain how each of the 10 statements is defamatory *per se*. Instead, he argues that the gist of the statements, when taken together, imputes both a lack of ability in his profession and a want of integrity in the discharge of his duties. In our view, the statements can be divided into the following three categories: (1) indications that the University had received a steady stream of student complaints between 1998 and 2000 that plaintiff acted rudely when dealing with students, spent too much class time on "non-course considerations," and was unprofessionally candid; (2) statements that the nature of the student allegations were "shocking, extremely bothersome," and "border[ing] on prejudice"; and (3) indications that both students and University administrators had conversations with plaintiff about these concerns, with the students indicating that they did not feel any sense of "being heard."

■ We determine that any statements that plaintiff acted rudely, spent too much class time on material unrelated to his course, and was "unprofessionally candid" constitute nonactionable opinion. What is considered rude or unprofessional differs from person to person. Likewise, Beitzel's impression that the facts underlying the student complaints were "shocking" and, in his opinion, "border[ing] on prejudice" are opinions.

 The statements that (1) students had made complaints over the years and had discussed them with plaintiff without satisfactory resolution, and (2) the University had discussed these complaints with plaintiff several times between 1998 and 2000, are capable of innocent construction and do not give rise to a defamation claim. They do not necessarily imply that plaintiff was unskilled or unqualified in his profession, or that he lacked integrity. Rather, they could reasonably be construed to mean that plaintiff did not fit in with the University or that his philosophies did not mesh with those of the University.

In *Anderson*, our supreme court held that an employer's comments to an employee's prospective employer that she did not "follow up on assignments" and did not get along with her coworkers could reasonably be construed to signify "nothing more than that the plaintiff did not fit in with [the defendant's] organization and perform well in that particular position." *Anderson*, 172 Ill. 2d at 415. In *Marczak v. Drexel National Bank*, 186 Ill. App. 3d 640, 643 (1989), the court ruled that the following statement was capable of innocent construction: " '[The plaintiff] did not perform up to the high standards expected of officers of the Bank. She had some problems getting along with her supervisors and other officers; at times she was uncooperative and did not have the Bank's best interest at heart; and she did recently refuse to perform one of the responsibilities of her position.' " In so holding, the court concluded that the statement could be interpreted to mean that the plaintiff had trouble getting along with others and did not fit into the organization. *Marczak*, 186 Ill. App. 3d at 645. Beitzel's comments about plaintiff can reasonably be construed in a similar fashion. Plaintiff has not cited any authority in which statements similar to those at issue in this case have been sufficient to sustain a cause of action for defamation *per se*.

In light of our determination that plaintiff cannot state a cause of action for defamation *per se*, we need not address defendant's contention that a qualified privilege applied to Beitzel's statements.

## CONCLUSION

For the foregoing reasons, the judgment of the circuit court of Lake County is affirmed in part and reversed in part, and the cause is remanded for further proceedings consistent with this disposition.

Affirmed in part and reversed in part; cause remanded.

O'MALLEY and CALLUM, JJ., concur.