# In the
# United States Court of Appeals
## For the Seventh Circuit

_____

Nos. 04-1098 & 04-1202

REPUBLIC TOBACCO CO.,

*Plaintiff-Appellee/Cross-Appellant*,

v.

NORTH ATLANTIC TRADING COMPANY, INC., et al.,

*Defendants-Appellants/Cross-Appellees.*

_____

Appeals from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 98 C 4011—**John F. Grady**, *Judge.*

_____

ARGUED JUNE 17, 2004—DECIDED SEPTEMBER 1, 2004

_____

Before FLAUM, *Chief Judge*, and MANION and WILLIAMS,
*Circuit Judges*.

FLAUM, *Chief Judge*. This appeal involves the claims that
two competing tobacco companies brought against one
another—one company suing for violation of antitrust laws,
the other for defamation. North Atlantic Trading Co., Inc.
("North Atlantic") was upset when its efforts to engage new
markets for its cigarette papers proved unsuccessful. It
blamed its difficulties in cultivating new customers on the
business practices of its competitor, Republic Tobacco
Company ("Republic") and decided to sue. The hard feelings

went both ways—Republic became upset with North Atlantic after North Atlantic criticized Republic's business practices in two letters sent to customers. Claiming that it had been defamed (among other things), Republic also decided to sue.

The parties' dueling lawsuits were eventually consolidated into one case before the United States District Court for the Northern District of Illinois. At summary judgment, the district court considered both parties' multiple claims and counterclaims—the only one to survive being Republic's defamation claim. Not only did it advance; it was successful at summary judgment. Following this judgment, a jury trial was held on the issue of damages, both presumed and punitive, for the defamation claim. The jury returned a verdict for $8.4 million in presumed damages and $10.2 million in punitive damages. The trial court granted North Atlantic's subsequent motion for remittitur, reducing the awards to $3.36 million and $4.08 million, respectively.

On appeal, North Atlantic seeks review of: (1) the district court's decision to grant summary judgment to Republic on its defamation claim; (2) the remitted damage awards; and (3) the district court's decision to grant summary judgment to Republic on North Atlantic's antitrust claims. Republic cross-appeals the district court's refusal to entertain a procedure that might have enabled Republic to appeal the remittitur. For the reasons stated in this opinion, we affirm the district court's decisions with respect to Republic's defamation claim, North Atlantic's antitrust claims, and Republic's cross-appeal. On the issue of damages, we vacate the district court's award of presumed and punitive damages, and award to Republic $1 million in presumed damages and $2 million in punitive damages.

## I. Background

Republic and North Atlantic are competitors in the market for premium roll-your-own ("RYO") cigarette papers, tobacco, and other tobacco-related products. Republic and North Atlantic sell their RYO products to distributors and wholesalers, who in turn resell the products to outlets such as convenience stores, drugstores, gas stations, and mini-marts. Republic's products are marketed under several brand names, including Job, Top, and Drum, while North Atlantic's products are marketed under the brand name Zig-Zag. North Atlantic's Zig-Zag has been the number-one selling domestic RYO cigarette paper brand since its introduction in the U.S. in 1938. North Atlantic estimates its domestic market share of cigarette paper is 49 percent or higher. Republic is the second largest supplier of cigarette paper, with a market share of approximately 25 percent. Robert Burton Associates ("RBA") is the third major competitor in the cigarette paper business.

In 1997, North Atlantic acquired an exclusive license to market and distribute the Zig-Zag brand of RYO papers in the United States. At this time, North Atlantic announced that it sought to challenge Republic's historic market dominance in the "Southeastern" United States—a group of nine states where Republic's total market share is as much as 95 to 98 percent. Things did not go according to North Atlantic's plan and the company experienced some difficulty in penetrating this market. Republic asserts that North Atlantic's disappointing sales growth in these states was the product of simple market economics, principally Republic's lower pricing and superior marketing strategy.

In contrast, North Atlantic claims that its sales difficulties were caused, in part, by Republic's unfair and unlawful business practices. North Atlantic believed Republic to be violating antitrust and unfair competition laws by pursuing

enhanced exclusivity agreements through its incentive programs for distributors and retailers. North Atlantic also claims that it believed Republic was violating trademark and unfair competition laws by defacing Zig-Zag display boxes.[1]

## A.  Disputed Statements

Naturally, in the course of business relations, North Atlantic and Republic sent letters to their customers. Statements contained in two letters sent from North Atlantic representatives to North Atlantic customers or potential customers that were critical of Republic's business practices form the basis of Republic's defamation suit. The first letter (the "Czerewko Letter") was sent to a potential customer in the course of North Atlantic and Republic's battle for retail outlets. The second letter (the "August 13 Letter") was sent to North Atlantic customers shortly after North Atlantic filed its lawsuit against Republic.

### 1. Czerewko Letter

In January 1998, North Atlantic Regional Manager John Czerewko sent a letter to a customer attacking the integrity of Republic's business conduct and accusing Republic of engaging in inappropriate activity with respect to the

---

[1]  Plastic display boxes were used to package RYO papers sold by North Atlantic in limited promotional runs. Customers received the display boxes along with their purchase of the products inside. Some of Republic's customers wanted to use the boxes to display and sell Republic's cigarette papers. To meet this demand, Republic obtained unused boxes from third-party distributors and then re-labeled the boxes with its own labels, restocked the boxes with its products, and made them available to customers upon request.

plastic display boxes. In late 1997, Clark Oil, one of the largest convenience store chains in the Midwest, elected to stock and sell Republic's products exclusively. Czerewko was involved in a North Atlantic campaign to convince Clark to drop its exclusivity with Republic. North Atlantic offered $95,000 in promotional money to Clark if it agreed to sell North Atlantic products, however this offer was less lucrative than the $110,000 offer Clark received from Republic.

In the course of courting this potential client, Czerewko wrote a one-page letter to Clark buyer Sanjiv Jain discussing Republic's competing proposal for exclusivity as well as the modifications to the display boxes. Czerewko wrote, "Frankly, I have some concerns not only with the Exclusivity proposal, the rationale, the Cigarette Paper category, but also for Clark in long term consequences." Below this sentence, are two boldface headings ("**The Republic Proposal for exclusivity**" and "**Similarity of Display Units**"), each with a series of bullet-points underneath. According to Republic and the district court, the defamatory statements in the Czerewko Letter consist of the following three sentences located under the "**Similarity of Display Units**" heading:

- Recently, another Chain was positioned for exclusivity and a modified, defaced Zig Zag unit was used. We own the patent-trademark which has been violated.

- Our Attorneys initiated legal action regarding this and had to include the Chain in the Trademark-Patent violation.

Republic contends that these statements were false and defamatory because North Atlantic held no patent or trademark rights in the boxes and had not initiated litigation against anyone in connection with the display boxes.

After receiving the Czerewko Letter, Clark forwarded it to Clark's supplier, Eby-Brown, which buys products directly from Republic and distributes them to retailers. Thereafter, Eby-Brown discontinued its participation in Republic's incentive programs. Clark subsequently discontinued its participation in Republic's incentive program as well.

### 2.  August 13 Letter

In June 1998, Republic filed this defamation action, a few days after Clark cancelled its exclusive contract. Two weeks later, North Atlantic filed a second suit in the U.S. District Court for the Western District of Kentucky, alleging unfair competition, deceptive trade practices, and antitrust violations. On August 13, 1998, North Atlantic sent a letter to all of its customers—many of whom were also customers of Republic—explaining that North Atlantic had filed a lawsuit against Republic, charging Republic with "unfair competition, deceptive trade practices and antitrust violations." The letter went on to describe the substance of these allegations as follows:

> The complaint alleges that Republic Tobacco's exclusivity agreements, rebates, incentive programs, buybacks and other activities violate federal and state antitrust and unfair competition laws. The complaint charges that Republic Tobacco entered into contracts, combinations, and conspiracies in illegal restraint of trade and has attempted to illegally monopolize, and has illegally monopolized, the roll-your-own ("RYO") cigarette paper market in the southeast United States.
>
> The complaint also alleges that Republic Tobacco has defaced and directed others to deface North Atlantic's and National Tobacco's vendor displays for ZIG-ZAG® RYO cigarette papers. On many of these vendors, the ZIG-ZAG® brand name has been covered up with an advertisement for JOB®, TOP®, and other Republic Tobacco

RYO cigarette brands. The lawsuit alleges that these activities violate North Atlantic's and National Tobacco's rights and constitute unfair competition under federal and state law.

Republic responded to the August 13 Letter with a letter of its own, calling North Atlantic's claims "frivolous," and asserting that they "were raised solely for the purpose of fulfilling [North Atlantic's] published business plan to increase revenue of the Zig Zag products primarily through price increases." (internal quotations omitted).

## B. Incentive Programs

North Atlantic's antitrust claims, as described in the August 13 Letter, are premised on Republic's alleged attempts to foreclose competition in the nine-state "Southeast" region through its incentive programs. The nine-state region, as defined by North Atlantic's economist, includes the states east of the Mississippi River and south of the Ohio River: Alabama, Florida, Georgia, Kentucky, Mississippi, North Carolina, South Carolina, Tennessee, and Virginia (collectively the "Southeast"). Historically, Republic's brands have been tremendously popular in each of these nine states.

Republic's incentive programs allowed participating customers to receive rebates, free products, and free travel in exchange for stocking or promoting specified amounts of Republic's RYO products and meeting certain sales goals.[2]

---

[2] The Republic Value-Added Rebate Incentive Program ("VRIP") provides incentives to distributors for stocking, promoting, and selling Republic's products to their retail accounts. Republic's Convenience Store Distribution Incentive Program ("CDIP") provides discounts to convenience stores to stock, promote, and sell Republic's products. The Republic Travel Plus Program, open

(continued...)

Program participants could enhance rebate and travel benefits by electing to sell Republic's brands of cigarette paper exclusively. These programs lasted for one year or less and were all terminable at will.

North Atlantic contends that Republics' incentive programs had the result of foreclosing North Atlantic products from the shelves of 46 percent of convenience stores in the Southeast, effectively eliminating choice in the region. Republic counters that its practices are not anticompetitive and its success in these states is due to its procompetitive incentive-based marketing strategy and its offering low, steady prices on its products at a time when North Atlantic raised its prices by more than 15 percent.

## C. Proceedings Below

Once served with the complaint in this case, North Atlantic sought to transfer this case to Kentucky, or to stay proceedings pending resolution of its Kentucky lawsuit, but the district court refused. North Atlantic then filed counterclaims against Republic in the court below, including the same antitrust claim presented in the Kentucky action. Accordingly, the case proceeded below, and the Kentucky court suspended the action.

Following extensive fact and expert discovery, the parties filed cross-motions for summary judgment. In its summary judgment order, the district court considered Republic's six-count Seconded Amended Complaint and North Atlantic's ten-count amended counterclaim. The district court granted Republic's motions with respect to all of North Atlantic's

---

[2] (...continued)
to both distributors and convenience stores, offers "points" to be used toward trips, such as cruises.

claims. With respect to the antitrust counterclaims, the court held that a determination of the relevant market was a necessary element of each count brought by North Atlantic. Although the court acknowledged that the definition of a relevant market is a question of fact and that the parties disagreed on the relevant geographic market, the court found that there was no evidence to support a definition of the nine-state Southeast as the relevant geographic market. The district court found that there was no doubt that Republic and North Atlantic operated in a nationwide market and that their purchasers, i.e., distributors and wholesalers, turn to suppliers across the nation for RYO papers. As North Atlantic did not argue that Republic monopolized, attempted to monopolize, unreasonably restrained trade in, or foreclosed competition in the national market for RYO papers, the district court granted summary judgment on each of North Atlantic's antitrust counterclaims.

In the same order, the district court granted Republic's motion for summary judgment on its defamation claim, holding that North Atlantic was liable for defamation *per se* as a matter of law in light of (1) the statements in the Czerewko Letter that "[w]e own the patent-trademark which has been violated," and "[o]ur Attorneys initiated legal action regarding this and had to include the Chain in Trademark-Patent violation," and (2) the statements in the August 13 Letter describing North Atlantic's Kentucky lawsuit allegations. According to the court, these statements were false assertions about Republic, were unprivileged, and were defamatory *per se* because they attacked the integrity of Republic's business conduct, prejudiced Republic in its business, and with respect to the August 13 Letter, accused Republic of illegal conduct.

Following the court's order, a jury trial was held to assess presumed and punitive damages on Republic's defamation claim. At trial, Republic introduced evidence to show that

its reputation had been harmed by North Atlantic's state-
ments. Three witnesses testified that after the August 13
Letter was sent, Republic received phone calls from its sales-
men and from dozens of customers indicating that custom-
ers thought less of Republic, were concerned that they had
been "dragged [ ] into illegal conduct," and were wary of
further participation in Republic's incentive programs.
Republic's President, Donald Levin, testified that reputation
is important in the small, closely regulated tobacco industry
and that Republic had built strong business relationships and
a good reputation over the years. Absent from Republic's
presentation was evidence that any customer reduced pur-
chases or severed business relations with Republic as a
direct result of North Atlantic's actions.

After a three-day trial, the jury returned a verdict in
Republic's favor of $8.4 million in presumed damages and
$10.2 million in punitive damages. Upon North Atlantic's
motion, the district court remitted these awards by 60 per-
cent, to $3.36 million and $4.08 million, respectively. The
court then gave Republic the option of accepting the remitti-
turs or facing a new trial. Republic accepted the remittiturs.
We now consider both parties' appeals.

## II.  Analysis

### A.  Defamation

We review *de novo* the district court's decision to grant
summary judgment in Republic's favor, construing all the
facts and inferences in favor of North Atlantic. *See Vision
Fin. Group, Inc. v. Midwest Family Mut. Ins. Co.*, 355 F.3d
640, 642 (7th Cir. 2004).

A defamatory statement is one that "tends to cause such
harm to the reputation of another that it lowers that person
in the eyes of the community or deters third persons from
associating with him." *Kolegas v. Heftel Broad. Corp.*, 607

N.E.2d 201, 206 (Ill. 1992) (citing Restatement (Second) of Torts § 599 (1977)). To make out a defamation claim under Illinois law, the plaintiff must show "that the defendant[ ] made a false statement concerning him, that there was an unprivileged publication to a third party with fault by the defendant, which caused damage to the plaintiff." *Krasinski v. United Parcel Serv., Inc.*, 530 N.E.2d 468, 471 (Ill. 1988) (citing Restatement (Second) of Torts § 588 (1977)).

Defamatory statements may be actionable *per se* or actionable *per quod*. Illinois courts have recognized four categories of statements that are considered defamatory *per se*: (1) words that impute the commission of a crime; (2) words that impute infection with a loathsome disease; (3) words that impute an inability to perform or a want of integrity in the discharge of duties of office or employment; or (4) words that prejudice a party, or impute lack of ability, in his or her trade, profession, or business. *See Kolegas*, 607 N.E.2d at 206. If a statement qualifies as defamatory *per se* (the theory upon which Republic solely relies), it is unnecessary for a plaintiff to demonstrate actual damage to reputation. Rather, statements that fall within these *per se* categories are thought to be so obviously and materially harmful to the plaintiff that injury to its reputation may be presumed. *See Owen v. Carr*, 497 N.E.2d 1145, 1147 (Ill. 1986). In contrast, with a *per quod* action, in order to recover the plaintiff must plead and prove that it sustained actual damage of a pecuniary nature ("special damages"). *See Dubinsky v. United Airlines*, 708 N.E.2d 441, 447 (Ill. App. Ct. 1999). For further discussion of *per quod* actions see *Bryson v. News America Publications*, 672 N.E.2d 1207, 1221 (Ill. 1996).

Under the Illinois innocent construction rule, even a statement that falls into one of the limited *per se* categories will not be found defamatory *per se* if it is "reasonably capable of an innocent construction." *Kolegas*, 607 N.E.2d at 206.

This rule "requires courts to consider a written or oral statement in context, giving the words, and their implications, their natural and obvious meaning." *Bryson*, 672 N.E.2d at 1215. If a statement may reasonably be interpreted innocently, it cannot be actionable *per se. See id.* However, the Illinois courts have firmly emphasized that "[o]nly *reasonable* innocent constructions will remove an allegedly defamatory statement from the *per se* category." *Id.* (emphasis in original). Whether a statement is reasonably capable of an innocent construction is a question of law for the court to decide. *See Kolegas*, 607 N.E.2d at 207.

A number of common law privileges and defenses exist that may shield a defendant from liability for making an otherwise defamatory statement. Four of these defenses and privileges, to varying degrees, are relevant to this appeal. First, a statement that does not contain any verifiable facts (as some call, "an opinion") is not actionable under Illinois law.[3] In Illinois, "[a] statement of fact is not shielded from an action for defamation by being prefaced with the words 'in my opinion,' but if it is plain that the speaker is expressing a subjective view, an interpretation, a theory, conjecture, or surmise, rather than claiming to be in possession of objectively verifiable facts, the statement is not actionable." *Haynes v. Alfred A. Knopf, Inc.*, 8 F.3d 1222, 1227 (7th Cir. 1993); *see also Wilkow v. Forbes, Inc.*, 241 F.3d 552, 555

---

[3] This principle overlaps with the constitutional protection for statements of on matters of public concern that are not provably false. *See Milkovich v. Lorain Journal Co.*, 497 U.S. 1 (1990). *Milkovich*, a federal constitutional law case, reflects the fact that the First Amendment imposes limits on state defamation law. However, we must first examine the threshold question of whether the challenged statements are actionable under Illinois law; if they are not, the First Amendment does not come into play. *See Wilkow v. Forbes, Inc.*, 241 F.3d 552, 555 (7th Cir. 2001); *Stevens v. Tillman*, 855 F.2d 394, 400 (7th Cir. 1988).

(7th Cir. 2001) (Illinois law); *Pope v. Chronicle Publ'g Co.*, 95 F.3d 607, 614 (7th Cir. 1996) (Illinois law); Restatement (Second) of Torts § 566 (1977) ("A defamatory communication may consist of a statement in the form of an opinion, but a statement of this nature is actionable only if it implies the allegation of undisclosed defamatory facts as the basis for the opinion."). Second, substantial truth is a complete defense to an allegation of defamation. *See Pope*, 95 F.3d at 613. This rule derives from the "recognition that falsehoods which do no *incremental* damage to the plaintiff's reputation do not injure the only interest the law of defamation protects." *Haynes*, 8 F.3d at 1228 (emphasis in original). Third, under Illinois law, publication of defamatory matters in a report of an official proceeding that deals with a matter of public concern is privileged as long as the report is accurate and complete. *See* Restatement (Second) of Torts § 611 (1977); *see also Catalano v. Pechous*, 419 N.E.2d 350, 360 (Ill. 1980). Fourth, Illinois law confers a privilege upon "[s]tatements made within a legitimate business context." *Larson v. Decatur Mem'l Hosp.*, 602 N.E. 2d 864, 867 (Ill. App. Ct. 1992). Under this rule, "[a] statement is conditionally privileged when the defendant makes it (1) in good faith; (2) with an interest or duty to be upheld; (3) limited in scope to that purpose; (4) on a proper occasion; and (5) published in a proper manner only to proper parties." *Id.* (citing *Zeinfeld v. Hayes Freight Lines, Inc.*, 243 N.E.2d 217, 221 (Ill. 1968)).

   Federal constitutional law adds another layer of limitations on the kind of defamatory statements for which a defendant may be found liable. At common law, defamation was a strict liability tort, but constitutional doctrine has imposed culpability, or fault, requirements in most cases. *See New York Times v. Sullivan*, 376 U.S. 254 (1964); *Gertz v. Robert Welch, Inc.*, 418 U.S. 323 (1974). The level of culpability is determined by whether the statement was of public concern and whether the plaintiff is a public or private fig-

ure. Moreover, overlapping with the common law rule, the First Amendment protects statements on matters of public concern that are not provably false. *See Milkovich*, 497 U.S. 1, 20 (1990). For further discussion of various First Amendment limitations to defamation actions see Ronald D. Rotunda & John E. Nowak, *Treatise on Constitutional Law: Substance and Procedure* §§ 20.33-20.35 (2d. ed. 1992).

As important to this appeal as the principles of defamation is the rule of waiver. "We have long refused to consider arguments that were not presented to the district court in response to summary judgment motions." *Arendt v. Vetta Sports, Inc.*, 99 F.3d 231, 237 (7th Cir. 1996) (quoting *Cooper v. Lane*, 969 F.2d 368, 371 (7th Cir. 1992)); *see also Maust v. Headley*, 959 F.2d 644, 650 (7th Cir. 1992); *DeValk Lincoln Mercury v. Ford Motor Co.*, 811 F.2d 326, 338 (7th Cir. 1987). Appellate review is not designed to serve as an unsuccessful party's second bite at the apple—an opportunity to raise issues and arguments that were not brought forth below. This is so even when the issue is an element of a plaintiff's prima facie case. *See Resolution Trust Corp. v. Juergens*, 965 F.2d 149, 153 (7th Cir. 1992) (the law of summary judgment "does not permit a nonmovant defendant to delay pointing out claimed flaws in the plaintiff's prima facie case until an appeal is underway"). As we said of waiver in *Boyers v. Texaco Refining and Marketing, Inc.*:

> It is axiomatic that issues and arguments which were not raised before the district court cannot be raised for the first time on appeal . . . . The rule is essential in order that parties may have the opportunity to offer all the evidence they believe relevant to the issues . . . [and] in order that litigants may not be surprised on appeal by final decision there of issues upon which they have had no opportunity to introduce evidence. To reverse the district court on grounds not presented to it would undermine the essential function of the district court.

>  This rule is not meant to be harsh, overly formalistic, or to punish careless litigators. Rather, the requirement that parties may raise on appeal only issues which have been presented to the district court maintains the efficiency, fairness, and integrity of the judicial system for all parties.

848 F.2d 809, 812 (7th Cir. 1988) (citations and quotations omitted).

With these principles in mind, we now turn to the statements at issue in this case.

### 1. Czerewko Letter

To review, the disputed statements in the Czerewko Letter consist of the following three sentences:

- Recently, another Chain was positioned for exclusivity and a modified, defaced Zig Zag unit was used. We own the patent-trademark which has been violated.

- Our Attorneys initiated legal action regarding this and had to include the Chain in the Trademark-Patent violation.

Republic asserts that the Czerewko Letter was designed to persuade Clark to abandon its exclusive deal with Republic, in favor of a less profitable deal from North Atlantic. Republic contends that to accomplish this task North Atlantic utilized a strategy of attacking Republic's lower prices, rebates and travel incentives with slander and threats.

North Atlantic responds that the Czerewko Letter was sent by a regional sales director to a single customer to propose a business relationship and express "concerns" about a competitor's proposal. North Atlantic contends that the letter's statements cannot reasonably be construed as objectively false and defamatory. Although North Atlantic did

not have patent rights in the display boxes, the company did believe that it had rights in those boxes (and indeed, it pursued a trademark claim below, albeit unsucessfully). According to North Atlantic, the Czerewko Letter simply expressed an opinion that the company's legal rights had been violated.

We disagree with North Atlantic's characterization of the Czerewko Letter and with its contention that the letter's organization as a list of "concerns" prevents the disputed statements from being actionable as defamation. As explained above, prefacing a defamatory statement with the phrase "in my opinion" does not shield a defendant from liability, and the same is true for presenting a defamatory statement under a list of "concerns." Prefatory language does not control whether these statements are actionable as defamation; what matters is whether the assertions included in the three disputed sentences are verifiably false.

We conclude that they are. These statements cannot be read as the expression of "a subjective view, an interpretation, a theory, conjecture, or surmise . . . ." *Haynes*, 8 F.3d at 1227. Nor are they mere sales puffery as can be found elsewhere in the letter (e.g., "Zig Zag is a magical name"). Rather, Czerewko is claiming to be in possession of objectively verifiable facts that could easily be evaluated in a defamation suit. *Did North Atlantic have trademark rights or hold a patent in the display boxes? Was this patent or trademark violated? Had legal action been pursed to enforce these rights? Had another chain been included in the legal action?* A jury could readily answer all of these questions and thereby verify the truthfulness of Czerewko's statements. What is more, the phrasing of these statements in the past tense makes them all the easier to separate out from statements expressing the speaker's subjective view. The reasonable reader would understand Czerewko to be informing him of events that have already occurred. While

it may be difficult in some circumstances to verify or refute a prediction about the future, it is relatively easy to do so when describing events that have allegedly occurred in the past.

In this case, however, it is unnecessary for a jury to examine the truth of Czerewko's statements as North Atlantic does not dispute that the underlying facts are false. That is, North Atlantic concedes that it had no trademark and held no patent on the display boxes; and it follows that there was no patent or trademark violation. Moreover, North Atlantic admits that at the time that the Czerewko Letter was written it had filed no lawsuit, so clearly then no other "chain" had been included in a lawsuit.

Still, North Atlantic urges us to give an innocent construction to the disputed statements. North Atlantic argues that we should interpret the sentence mentioning "legal action" as either true (because the word "action" could mean "activity" and not just a lawsuit) or nondefamatory (because simply saying that someone has been sued is not defamatory in this litigious day and age). To benefit from the innocent construction rule, a statement must be reasonably susceptible to an innocent interpretation. "When a defamatory meaning was clearly intended and conveyed, [Illinois courts] will not strain to interpret allegedly defamatory words in their mildest and most inoffensive sense in order to hold them nonlibelous under the innocent construction rule." *Bryson*, 672 N.E.2d at 1217. If we interpret the words according to the meaning that they were intended to convey to the reasonable reader, it is clear that they are both false and defamatory. First, the words "legal action" can only be intended to mean some sort of lawsuit or official proceeding and not mere discussion between parties (which is the interpretation required to render the statement true). It stretches reason to interpret "legal action" as "any activity of a lawyer" when it is used in daily parlance to mean a

lawsuit or legal proceeding. Second, we are unpersuaded by North Atlantic's argument that litigation is a fact of life and that a statement that a corporation has been sued is not, of itself, defamatory. Even if that were true, the statement was not simply that Republic had been sued, but it provided factual detail about Republic's alleged inappropriate activity. We also must bear in mind that the Czerewko Letter was sent to a Republic customer in order to convince the customer to establish an exclusive relationship with North Atlantic.

North Atlantic further argues that the district court erred by granting Republic summary judgment on its defamation claim without requiring Republic to prove that it was injured by the statements in the Czerewko Letter. However, it was unnecessary for Republic to plead and prove special damages as the allegations in the Czerewko Letter fit into at least two *per se* categories—malfeasance or misfeasance in the performance of an office or a job and unfitness for one's profession or trade. That is, the Czerewko Letter suggests that Republic was involved in improperly defacing its competitor's merchandise and conducting its business in violation of trademark and patent laws. North Atlantic again contends that it is entitled to an innocent construction for these statements. However, as we noted in *Haynes*, "Illinois courts (and federal courts when interpreting Illinois law) have been quick to find implications of criminal conduct or of employee or business misconduct in statements that might have seemed susceptible of an interpretation that would have taken them out of the per se categories." 8 F.3d at 1226. Again, considering the letter's context and the words' natural and obvious meaning, we conclude that an innocent construction of the Czerewko Letter would be inappropriate.

Finally, with respect to the Czerewko Letter, North Atlantic raises the following three issues that were not presented to

the district court at summary judgment: (1) the Czerewko Letter did not contain any defamatory statements "of and concerning" Republic; (2) the district court made no inquiry into fault; and (3) the Czerewko Letter is privileged as a statement made within a legitimate business context. Despite North Atlantic's vigorous efforts to convince us that these issues command reversal of the district court's judgment, we are unable to consider the arguments related to any of them because North Atlantic waived them by not raising them prior to appeal.

### 2. August 13 Letter

Turning to the August 13 Letter, North Atlantic's main contention is that the description of its antitrust claims is not a statement of fact concerning Republic; rather, it is a statement of opinion regarding the legality of Republic's practices. According to North Atlantic, every lawsuit expresses the plaintiff's opinion that the defendant's conduct has violated the law. An expression of that opinion, North Atlantic contends, is not actionable as a false and defamatory factual statement, regardless of how a court ultimately resolves the plaintiff's claims on the merits. North Atlantic warns of dire consequences if the district court's ruling is upheld—suggesting that unsuccessful plaintiffs will become *per se* liable for defamation for having alleged incorrectly that the defendant violated the law and that judicial proceeding will have to be conducted in secret.

Republic responds that North Atlantic waived this argument by failing to raise it below. North Atlantic counters that it "consistently argued that the August 13 letter did not contain a false statement of fact, and hence was not actionable, because it accurately summarized the allegations of the Kentucky lawsuit." Looking to record, we see that North Atlantic did argue below that the August 13

Letter did not raise a false statement of fact. However, it did so by making an argument based on truth. *See* Memorandum of Law in Support of Defendant's Motion for Summary Judgment at 17-18 ("The statements allegedly attributable to . . . the August 13 letter accurately summarize the claims set forth in North Atlantic's legal pleadings. Accordingly, the statements are true and non-actionable."). North Atlantic is therefore attempting on appeal to recast its truth defense as an opinion defense. But under Illinois law truth and opinion are two separate defenses. *See Pope*, 95 F.3d at 613-14 (listing "substantial truth" and "statement of opinion" as two separate defenses). We, therefore, agree with Republic that North Atlantic waived the opinion defense by failing to raise it below. In any event, North Atlantic's position seems akin to a rule that filing a lawsuit provides blanket protection for one seeking to publicize false facts. This is a proposition that we, of course, find unsettling. Moreover, we are unimpressed by North Atlantic's *in terrorem* argument that finding liability here will have the effect of muzzling litigants, as North Atlantic's argument fails to take into account common law and constitutional defenses that protect parties speaking on matters of common interest or public concern.

Next, North Atlantic contends that the August 13 Letter is protected by common law privilege as a description of an official proceeding. In Illinois, this privilege protects publications that fairly and accurately report an official action or proceeding. *See Catalano v. Pechous*, 419 N.E.2d 350, 360-61 (Ill. 1980). The district court held this privilege inapplicable to the August 13 Letter for two reasons: (1) North Atlantic made the underlying allegations in the Kentucky lawsuit, and could not "confer the privilege upon itself", and (2) the basis of this privilege is the public's interest in official proceedings, and North Atlantic disseminated the information to its own customers, not the public. In response to the first

reason, North Atlantic argues that as long as the underlying lawsuit itself is not objectively baseless (designed solely to immunize otherwise defamatory statements), there is no reason in law or logic to strip the plaintiff of the privilege. This is an argument for the modification or extension of Illinois law, and as a federal court sitting in diversity, we are obligated to apply Illinois law as announced by the Illinois Supreme Court. In circumstances where a state supreme court has not issued a ruling on the issue presented, "the rulings of the intermediate court control, unless there is a persuasive indication that the highest court would decide the issue differently." *Allstate Ins. Co. v. Keca*, 368 F.3d 793, 800 (7th Cir. 2004).

While the Illinois Supreme Court has not directly addressed whether this privilege may be "self-conferred"—i.e., by filing a pleading and then reporting on it, we are confident that if presented with the issue, the Illinois Supreme Court would determine that the privilege may not be self-conferred. It is significant in our view that the Illinois Supreme Court has adopted the official proceeding privilege as expressed in the Second Restatement § 611. *See Catalano*, 419 N.E.2d at 360-61 (abandoning § 611 of the Restatement (First) of Torts and adopting § 611 of the Restatement (Second) of Torts). The commentary to the Second Restatement of Torts states:

> A person cannot confer this privilege upon himself by making the original defamatory publication himself and then reporting to other people what he had stated. This is true whether the original publication was privileged or not.

Restatement (Second) of Torts, § 611, comment c (1977).

Given that the Illinois Supreme Court has adopted § 611, we think it likely that they would follow this commentary as well. Moreover, our conclusion is bolstered by a ruling from an Illinois appellate court holding that this privilege

may not be self-conferred. *See Kurczaba v. Pollock*, 742 N.E.2d 425, 443 (Ill. App. Ct. 2000) (finding the fair report privilege not available to defendant who circulated his own complaint to third parties).

We are unpersuaded by North Atlantic's arguments that the Illinois Supreme Court would decide the issue differently. North Atlantic relies primarily on *ADT Co. v. Brink's Inc.*, 380 F.2d 131 (7th Cir. 1967), a case in which this Court (applying Illinois law) held that a defamation defendant was entitled to invoke the privilege with respect to statement made in a press release describing a lawsuit against its competitor. Putting aside any factual differences between that case and the one before us now, *Brink's* was based on the First Restatement, which did not have language analogous to comment c of the Second Restatement.[4]

Next, we address North Atlantic's contention that the district court erred in failing to require Republic to prove fault. Under *Gertz v. Robert Welch, Inc.*, 418 U.S. 323 (1974), North Atlantic argues that Republic was obligated to show at least negligence, and to the extent that this case involves a matter of public concern, Republic was required to show actual malice. Republic responds that North Atlantic waived this argument by not raising it before the district court. We agree that by failing to point out this alleged deficiency in Republic's case prior to appeal North Atlantic waived this argument.

Finally, North Atlantic contends that the district court erred by granting summary judgment to Republic without requiring Republic to prove that it was injured by the August 13 Letter. As with the Czerewko Letter, the state-

---

[4] The rule against self-conferral renders this privilege inapplicable to the August 13 Letter, and it is therefore unnecessary for us to address the alternate ground upon which the district court supplied for its decision.

ments of the August 13 Letter fit comfortably within several *per se* categories. North Atlantic accuses Republic of defacing property and operating its business in violation of federal and state law. North Atlantic argues that under the innocent construction rule, the August 13 Letter can reasonably be construed as describing North Atlantic's good-faith allegations about the legality of Republic's conduct. North Atlantic's position is beside the point, though, because regardless of North Atlantic's professed intentions, the letter substantively conveys objectively verifiable facts which can only be read one way. North Atlantic's position seeks to turn the innocent construction rule into a subjective test. The test is objective: it asks whether there is an objectively reasonable innocent interpretation of the allegedly defamatory statements. In this case, we conclude that there is not.

### B. Damages

With respect to the damage awards, North Atlantic argues that the district court erred in the following three ways: (1) by allowing the jury to award presumed damages and punitive damages absent a predicate determination of actual malice; (2) by refusing to consider whether $3.36 million in presumed damages is impermissibly "substantial," and by allowing Republic to recover that amount; and (3) by permitting Republic to recover punitive damages at all, much less an award of $4.08 million. We address each argument in turn.

First, we review *de novo* North Atlantic's contention that the district court committed legal error by allowing Republic to recover damages without making a predicate determination of fault. North Atlantic contends that Illinois law requires a plaintiff to prove actual malice, i.e., knowledge of falsity or reckless disregard for truth or falsity, to recover either presumed or punitive damages. North Atlantic's position has merit. Indeed, the Illinois Supreme Court has never approved

the recovery of punitive or presumed damages on less than actual malice. *See, e.g., Babb v. Minder*, 806 F.2d 749, 758 (7th Cir. 1986) ("Under Illinois law, . . . only upon a showing of actual malice may damages be presumed and punitive damages be awarded."); *Troman v. Wood*, 340 N.E.2d 292, 296 (Ill. 1975) ("Only if liability was predicated on actual malice could punitive damages be awarded or actual damages be presumed."). And while the United States Supreme Court has held that the federal Constitution does not prohibit a private individual from recovering punitive or presumed damages upon a showing of less than actual malice when the statements in question do not involve a matter of public concern, *see Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749, 773-74 (1985), the Illinois Supreme Court has yet to decide, as a matter of state law, whether this lower threshold of recovery will be permitted.

However, none of this aids North Atlantic. First of all, North Atlantic waived this argument by failing to propose a jury instruction requiring a predicate finding of actual malice for general damages or to object to the court's instruction on that ground. *See* Fed. R. Civ. P. 51; *Gordon v. Degelman*, 29 F.3d 295, 298 (7th Cir. 1994). Furthermore, while there was no actual malice instruction given for presumed damages, the court instructed the jury that it could award punitive damages only if it found that North Atlantic "knew [its] statements were untrue" or "made the statements with conscious disregard as to whether they were true or not." This standard is at least as strict as the actual malice standard of knowledge or reckless disregard. Following this instruction, the jury awarded punitive damages to Republic. Thus, the jury necessarily found that North Atlantic acted with "knowledge or conscious disregard" of the statements' falsity and, *a fortiori*, that the actual malice standard had been met.

Second, we consider North Atlantic's argument that the district court abused its discretion by allowing Republic to

recover $3.36 million in presumed damages. Because this is a case of defamation *per se*, proof of actual damage was unnecessary and Republic was entitled to presumed damages. After a trial on damages, the jury awarded Republic $8.4 million is presumed damages, which the district court later reduced to $3.36 million. In remitting the award, the district court explained that it agreed with North Atlantic's "most basic argument: $8.4 million is simply excessive given the evidence of harm in this case." *Republic Tobacco L.P. v. North Atlantic Trading Co., Inc.*, No. 98-C-4011, 2003 WL 22794561, at *7 (N.D. Ill. Nov. 23, 2003). We review the district court's remittitur decision for an abuse of discretion. *See McNabola v. Chicago Transit Authority*, 10 F.3d 501, 516 (7th Cir. 1993).

North Atlantic contends that under Illinois law an award of presumed damages may not be "substantial," *see Brown & Williamson Tobacco Corp. v. Jacobson*, 827 F.2d 1119, 1142 (7th Cir. 1987); *Bloomfield v. Retail Credit Co.*, 302 N.E.2d 88, 97 (Ill. App. Ct. 1973) ("Substantial damages are not presumed."), and that $3.36 million falls into this impermissible category. By definition, presumed damages are speculative in nature, and this limitation on presumed damages protects a defamation defendant from being subjected to an astronomical award based upon a jury's guess about the plaintiff's unproven harm. In *Brown & Williamson*, this Court explained Illinois law as requiring, "an appellate court to give some deference to the jury's determination of presumed damages while also considering whether it considers the jury award of presumed damages excessive. If it finds the award excessive, the court may exercise discretion and reduce the award to what it considers a more appropriate figure." 827 F.2d at 1141.

Following this principle, we hold that the district abused its discretion in allowing $3.36 million in presumed damages. We conclude that a presumed damages award of $1 million is more appropriate in this case. Republic failed to identify any presumed damages award in the history of Illinois law

remotely in the vicinity of $3.36 million. (In fact, the most sizeable award identified was the award of $1 million, remitted from $3 million, in *Brown & Williamson*.) In a case lacking proof of economic injury[5] and where the defamatory statements were publicized to a relatively limited audience (North Atlantic's customers and potential customers), it would be inappropriate to award presumed damages that are exponentially greater than have been awarded in past cases. While we are mindful that under the doctrine of presumed damages a party is not required to show specific loss, there must be some meaningful limit on the magnitude of a jury award when it is arrived at by pure speculation. Presumed damages serve a compensatory function— when such an award is given in a substantial amount to a party who has not demonstrated evidence of concrete loss, it becomes questionable whether the award is serving a different purpose. An award of $1 million is sizeable enough to compensate Republic for the damage that we presume was caused to its reputation in the tobacco industry and the harm that we presume was done to the business relationships it cultivated over the years, yet not so substantial as to be out of line with other presumed damages awards allowed under Illinois law.

Third, North Atlantic requests that the award of punitive damages be reversed, arguing that they should not have been allowed at all, or in the alternative, that the award should be substantially remitted. We will consider these arguments separately.

North Atlantic argues that the conduct at issue in this case does not meet the demanding standard for awarding punitive damages under Illinois law. In a diversity proceeding,

---

[5] Indeed, the failure to prove economic injury prompted the district court to grant North Atlantic summary judgment on Republic's tortious-interference claim—a ruling from which Republic has not cross-appealed, but a cause of action in which this case seems to most comfortably fit, putting the actual injury requirement aside.

state law governs whether punitive damages are appropriate. *See Ross v. Black & Decker, Inc.*, 977 F.2d 1178, 1187 (7th Cir. 1992). Punitive damages are available under Illinois law upon proof of actual malice. *See Brown & Williamson*, 827 F.2d at 1142; *see also J.I. Case Co. v. McCartin-McAuliffe Plumbing & Heating, Inc.*, 516 N.E.2d 260, 263 (Ill. 1987) (explaining that punitive damages may be awarded when the defendant acts "with fraud, actual malice, deliberate violence or oppression, or when the defendant acts willfully, or with such gross negligence as to indicate a wanton disregard for the rights of others"). As explained above, the jury was instructed that in order to award punitive damages it must find that the defendant acted with "knowledge or conscious disregard"—a standard stricter than actual malice. Since this is essentially a sufficiency of the evidence argument, we ask only whether a rational jury could conclude that North Atlantic's statements were made with knowledge or reckless (or conscious) disregard of their falsity. A rational jury could so conclude. Evidence was presented that in order to gain a business advantage over its competitor, North Atlantic made statements without regard to their truth. The nature and timing of the events are probative of North Atlantic's willful intent—the combination of the cutthroat competition that existed between the companies, the substance of the letters, and the identity of the recipients supports the conclusion that North Atlantic deliberately used the letters to harm Republic's business.

We are more receptive to North Atlantic's claim that the amount of punitive damages awarded was excessive. The jury awarded Republic $10.2 million in punitive damages, which the trial court remitted to $4.08 million. In a diversity action, state law governs the factors a jury may consider in determining the amount of punitive damages, while federal law governs the district court's review of the jury award and appellate review of the district court's decision. *See Black & Decker*, 977 F.2d at 1189. We review the district court's determination on the size of the jury verdict for an abuse of

discretion. *Id.* Under Illinois law, three factors are particularly relevant in analyzing the amount of a punitive damages award: "(1) the nature and enormity of the wrong, (2) the financial status of the defendant, and (3) the potential liability of the defendant resulting from multiple claims." *Hardin, Rodriguez & Boivin Anesthesiologists, Ltd. v. Paradigm Ins. Co.*, 962 F.2d 628, 640 (7th Cir. 1992) (citing *Hazelwood v. Illinois Central Gulf. Railroad*, 450 N.E.2d 1199, 1207 (Ill. 1983)).

We concentrate on the first factor. We generally agree with the district court's comprehensive analysis supporting its decision to remit the jury's punitive damage award, but, in view of our discussion of presumed damages above, we conclude that the district court did not go far enough in remitting the punitive damage award. While evidence supports the jury's determination that North Atlantic acted with the requisite malice to justify punitive damages, the "nature and enormity of [North Atlantic's] wrong" does not justify a $10.2 million award, or even a $4.08 million award. We therefore further reduce the punitive damage award to $2 million.

## C.  Antitrust

North Atlantic argues that the district court erred by concluding that North Atlantic's antitrust claims had to fail on the ground that North Atlantic did not establish the existence of a distinct geographic market. This Court's review of summary judgment is *de novo. See Vision Fin. Group, Inc. v. Midwest Family Mut. Ins. Co.*, 355 F.3d 640, 642 (7th Cir. 2004).

North Atlantic's antitrust claims included that Republic (1) entered into unlawful agreements in unreasonable restraint of trade in violation of Section 1 of the Sherman Act, *see* 15 U.S.C. § 1; (2) acted unlawfully to attempt to monopolize and monopolize in violation of Section 2 of the Sherman Act, *see* 15 U.S.C. § 2; and (3) entered into unlawful

exclusive dealing agreements that substantially lessen competition in violation of Section 3 of the Clayton Act, *see* 15 U.S.C. § 14.

A determination of the relevant market is ordinarily required for all of North Atlantic's claims. However, as North Atlantic argues, there are some circumstances where to establish a violation of antitrust laws it is unnecessary to prove that defendant wielded market power in a properly defined product and geographic market, and may rely instead on direct evidence of anticompetitive effects. *See FTC v. Indiana Fed'n of Dentists*, 476 U.S. 447, 460-61 (1986). Relying on our decision in *Toys "R" Us, Inc. v. FTC*, 221 F.3d 928 (7th Cir. 2000), North Atlantic argues that this is such a case. In *Toys "R" Us*, this Court upheld an Federal Trade Commission finding that a powerful chain store owner had coordinated a horizontal agreement among toy manufacturers to restrict distribution to warehouse clubs. 221 F.3d at 940. Because the FTC had demonstrated that the boycott organized by Toys "R" Us was having an effect in the market, the Court held that the FTC did not need to prove the contours of a distinct geographic market to state an antitrust claim. *See id.* at 937; *see also Indiana Fed'n of Dentists*, 476 U.S. at 460-61 (holding that, in light of direct evidence of anticompetitive effects, the FTC did not need to prove the contours of a distinct geographic market in order to prove that a group of dentists had violated the antitrust laws by agreeing not to provide insurers with x-rays when submitting claims).

North Atlantic's reliance on *Toys "R" Us* is misplaced. *Toys "R" Us* made very clear that despite the vertical agreements between Toys "R" Us and individual manufacturers, the conspiracy at issue was horizontal. Horizontal agreements, which have not been alleged in this case, are illegal *per se.* Unlike horizontal agreements between competitors, vertical exclusive distributorships (like in this case) are presumptively legal. *See CDC Techs., Inc. v. IDEXX Labs., Inc.*, 186 F.3d 74, 80-81 (2d Cir. 1999). Rather than condemning

exclusive dealing, courts often approve them because of their procompetitive benefits. *See, e.g.*, *Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 395 (7th Cir. 1984) (exclusive dealing eliminates divided loyalties and reduces free riding). In fact, emphasizing the existence of a horizontal conspiracy, *Toys "R" Us* contrasted the situation in that case with the "typical story of a legitimate vertical transaction" in which the manufacturer sought exclusivity in exchange for what it hoped would be more effective promotion of its goods. 221 F.3d at 936. As horizontal agreements are generally more suspect than vertical agreements, we must be cautious about importing relaxed standards of proof from horizontal agreement cases into vertical agreement cases. To do so might harm competition and frustrate the very goals that antitrust law seeks to achieve. *Cf.*, *e.g.*, *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 763-64 (1984) (noting the dangers of imposing too low a standard of proof in antitrust cases); *InterVest, Inc. v. Bloomberg, L.P.*, 340 F.3d 144 (3d Cir. 2003) (citing the "chilling effect on lawful conduct that would result from the unreasonable interpretation of evidence").

Nonetheless, the fact that "direct evidence of anticompetitive effects" has not been used outside the context of horizontal agreements does not entirely dispose of North Atlantic's argument. It may be that, in a proper case alleging vertical restraints, a direct anticompetitive effects analysis could be used to show market power. But this is not that case. North Atlantic fails to recognize that neither *Toys "R" Us* nor *Indiana Federation of Dentists* allows an antitrust plaintiff to dispense entirely with market definition. Rather, these cases stand for the proposition that if a plaintiff can show the rough contours of a relevant market, and show that the defendant commands a substantial share of the market, then direct evidence of anticompetitive effects can establish

the defendant's market power[6]—in lieu of the usual show-ing of a precisely defined relevant market and a monopoly market share.

For example, in *Indiana Federation of Dentists*, there was no dispute that the product market was, roughly speaking, dental services; all seemed to agree to "the reality that mar-kets for dental services tend to be relatively localized"; and the FTC found "adverse effects on competition in those areas where IFD dentists *predominated*." *Ind. Fed'n of Dentists*, 476 U.S. at 461 (emphasis added). In other words, there was no significant dispute about the rough contours of the relevant market, and the FTC's findings only applied where the IFD dentists commanded a substantial market share. Likewise in *Toys "R" Us*, the product market (the wholesale toy mar-ket) was not contested; the geographic market was assumed to be national; and Toys "R" Us had "20% of the national wholesale market and up to 49% of some local wholesale markets." *Toys "R" Us*, 221 F.3d at 937. These circumstances were enough, we held, to allow an inference of market power from direct evidence of anticompetitive effects.

The situation before us now is entirely different because of the dispute about the relevant geographic market. *Toys "R" Us* and *Indiana Federation of Dentists* do not excuse North Atlantic from providing evidentiary support for its putative Southeast geographic market. Economic analysis is virtually meaningless if it is entirely unmoored from at least a rough definition of a product and geographic market. As we explain below, there is no evidentiary support for the putative Southeast geographic market. Therefore, North Atlantic cannot even cross the threshold into a *Toys "R" Us*-

---

[6]   Indeed, even the references to "plaintiff" and "defendant" are ques-tionable, as both *Toys "R" Us* and *Indiana Federation of Dentists* originated not as private-party civil litigation, but as agency pro-ceedings before the Federal Trade Commission.

style proof of market power through direct evidence of anticompetitive effects.

Thus, because North Atlantic can draw no support from *Toys "R" Us* or *Indiana Fed'n of Dentists*, and exclusive dealing arrangements violate antitrust laws only when they foreclose competition in a substantial share of the line of commerce at issue, *see Tampa Electric Co. v. Nashville Coal Co.*, 365 U.S. 320, 320-27 (1961), North Atlantic must precisely establish a relevant market. The relevant market has both a product and a geographic dimension. *See Brown Shoe Co. v. United States*, 370 U.S. 294, 324 (1962). The parties agree that the relevant product market is the market for premium RYO cigarette papers. The relevant geographic market, however, is disputed. North Atlantic contends that the market is limited to the Southeast region of the United States, which it defines as Alabama, Florida, Georgia, Kentucky, Mississippi, North Carolina, South Carolina, Tennessee, and Virginia. Republic counters that the relevant market is nationwide and that North Atlantic has failed to establish sufficient facts to demonstrate that the nine states that make up the so-called Southeast are in fact a relevant market.

Identifying a geographic market requires both, "careful selection of the market area in which the seller operates, and to which the purchaser can practicably turn for supplies." *Tampa Electric*, 365 U.S. at 327. Applying the two-part test to this case, the district court concluded that the only possible market supported by the evidence is national, and that it was therefore unnecessary to present the question to a jury. We agree.

With respect to the first prong, it is undisputed that North Atlantic, Republic, and their competitors operate nationally and sell to wholesale customers all over the United States. All three of the top suppliers (North Atlantic, Republic and RBA) publish national price lists.

With respect to the second prong, Republic presented unrebutted evidence that distributors and wholesalers can practically (and in fact do) turn to suppliers across the nation for RYO cigarette paper. Before the district court, North Atlantic argued that the relevant purchasers were indirect customers (i.e., retailers and consumers) rather than the direct customers (i.e., distributors and wholesalers)—a position the district court rejected and that North Atlantic does not explicitly now reassert. Rather, North Atlantic contends on appeal that Republic's sales contracts (which included restrictions on buying or selling Republic's product to or from other wholesalers) made it impossible for wholesalers to turn to outside suppliers for Republic's products outside of their region. This argument puts the cart before the horse—contracts represent transactions that have occurred within the market. The question of what transactions have occurred in the market is subsequent to and therefore irrelevant to the definition of the market itself.

Additionally, North Atlantic argues that as a result of barriers to entry caused by "transportation costs and the realities of the market," wholesalers outside the Southeast are not well-positioned to enter the region to sell competing product. Even if this convenience-based argument could meet the *Tampa Electric* standard of practicability, this argument (and to some extent the argument previously discussed) reverts to the position advanced at the district court that consumers and retailers are the "purchasers" for purposes of the geographic analysis. This is wrong because Republic and North Atlantic do not sell cigarette papers to retailers and consumers. They sell to distributors and wholesalers. Accordingly, the evidence presented regarding where wholesalers can practicably sell their products (or in other words, where customers and retailers practicably turn for alternative sources of RYO paper) is beside the point when it comes to market definition. Thus, the primary defect

in North Atlantic's geographic argument remains— North Atlantic has not identified any evidence presented at trial indicating that wholesalers and distributors in the Southeast because of market forces were only able to turn to suppliers in that region.

This conclusion is hardly surprising, as tobacco products generally have been found to have national markets. *See, e.g., FTC v. Swedish Match*, 131 F. Supp. 2d 151, 166 (D.D.C. 2000) (loose leaf chewing tobacco); *R.J. Reynolds Tobacco Co. v. Philip Morris Inc.*, 60 F. Supp. 2d 502, 504 (M.D.N.C. 1999) (cigarettes).

As there is no genuine issue that the relevant geographic market in this case is a national market, and North Atlantic does not argue that Republic has a monopoly or has attempted to monopolize in the national market, summary judgment was appropriately granted on all of North Atlantic's antitrust claims.


**D. Cross-Appeal**

On cross-appeal, Republic challenges "the longstanding rule that a plaintiff in a federal court . . . may not appeal from a remittitur order he has accepted." *Donovan v. Penn Shipping Co., Inc.*, 429 U.S. 648, 650 (1977). An order that offers a choice between a remitted award and a new trial is not a final decision, and if a plaintiff agrees to accept the reduced judgment in the trial court, that plaintiff may not later argue that the jury's verdict should be reinstated on appeal. *Id.* However, if the plaintiff declines to accept the reduced award, no appeal may be taken until after a new trial. *See Ash v. Georgia-Pacific Corp.*, 957 F.2d 432, 437 (7th Cir. 1992). Because Republic accepted the remittitur here, instead of facing a second trial, it cannot challenge the remittitur. *See id.* at 437-38.

However, Republic contends that *Ash* allows for a third option for successful plaintiffs facing remittitur—stipulating that a second trial would result in entry of judgment in the amount equal to the remitted award and appeal the remittitur based on that stipulation—and the district court erred in refusing to allow Republic to pursue this course. Republic argues that absent this option, in order to obtain appellate review of a remittitur, a successful plaintiff must undertake a seemingly endless series of new trials—until one jury produces a verdict that squares with the trial judge's view of an appropriate verdict. We disagree with Republic's reading of *Ash*. *Ash* suggests that a plaintiff may expedite appeal by taking "a pratfall" on a new trial, meaning that the plaintiff can accept defeat in the second trial by failing to put up a real fight and then appeal seeking reinstatement of the first jury's verdict. *Ash* explained that if a plaintiff "cannot afford the same elaborate presentation it mustered the first time, or if the absence of witnesses . . . undermines the case, then [the plaintiff] may do poorly— but it has the first verdict to fall back on. A party electing the new-trial branch of the remittitur option may take a pratfall as quickly as it pleases, and thus expedite the appeal." *Id.* at 438. Nowhere does *Ash* suggest that the *Donovan* may be completely circumvented by simply stipulating that a second trial would result in a judgment equal to the remitted award. We therefore reject Republic's invitation to sanction such a procedure.

### III.  Conclusion

For the reasons given in this opinion, we AFFIRM the district court's grant of summary judgment to Republic on its defamation claim and North Atlantic's antitrust claims. We AFFIRM the district court's decision with respect to Republic's cross-appeal. We VACATE the district court's remitted

damages award and order entry of judgment for $1 million in presumed damages and $2 million in punitive damages.

A true Copy:

Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*